Jennifer L. LEFEBVRE, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 623, 2009.

Supreme Court of Delaware.

Submitted: Feb. 23, 2011.

Decided: April 26, 2011.

Reargument Denied May 26, 2011.

Eric G. Mooney, Esquire (argued) and James D. Nutter, Esquire, Mooney & Nutter, P.A., Georgetown, Delaware, for appellant.

Paul R. Wallace, Esquire (argued) and Sean P. Lugg, Esquire, Deputy Attorneys General, Wilmington, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

HOLLAND, Justice, for the majority:

The defendant-appellant, Jennifer Lefebvre ("Lefebvre"), appeals from a Superior Court judgment of conviction for Driving Under the Influence of Alcohol.[1] Lefebvre's conviction arises from an arrest made by Delaware State Police officers on February 12, 2009.[2] Lefebvre filed a pretrial motion to suppress the results of an intoxilyzer test administered to determine her breath alcohol concentration ("BAC"). In support of her motion to suppress, Lefebvre argued, *inter alia*, that there was no probable cause to arrest her for a DUI offense.[3]

The Superior Court denied the motion to suppress in a bench ruling. In order to preserve her appellate rights, Lefebvre consented to a stipulated trial. At trial, the parties agreed to admit the evidence produced during the suppression hearing and that Lefebvre was operating a motor vehicle in Sussex County on the date and time alleged in the indictment. Lefebvre's BAC test result was also admitted as a State's exhibit.

Based on the stipulated evidence, the trial judge found Lefebvre guilty of the charge of Driving Under the Influence of Alcohol in violation of title 21, section 4177 of the Delaware Code. The trial judge immediately sentenced Lefebvre to serve two years of incarceration at Level 5, to be suspended after Lefebvre served the ninety-day mandatory jail term required for a third offense. Lefebvre's jail sentence was followed by eighteen months of Level 3 probation.

The sole issue raised by Lefebvre in this appeal is that the Superior Court erroneously denied her motion to suppress. We have concluded that argument is without merit. Therefore, the judgment of the Superior Court must be affirmed.

### Facts [4]

The State presented testimony at the hearing on the motion to suppress from the two officers, Delaware State Police Sergeant Darren Short ("Sergeant Short") and Trooper Brian Page ("Trooper Page"), both who participated in Lefebvre's arrest. Sergeant Short testified that he had been

---

1. Del.Code Ann. tit. 21, § 4177(d)(3).

2. Lefebvre was cited at the same time with violations of title 21, section 4123 (following a motor vehicle too closely) and title 21, section 2118 (failure to have insurance identification in possession). The State entered a *nolle prosequi* as to these charges and they are not at issue in the present appeal.

3. Lefebvre also argued she was stopped by an off-duty police officer who lacked authority to make the arrest, a contention which, based on the evidence presented at the suppression hearing, is not being advanced by her in this appeal.

4. The recitation of facts in this opinion is taken primarily from the opening brief that Lefebvre filed in this appeal.

employed by the State Police for sixteen years and is currently in charge of the Kent County Drug Task Force stationed out of Troop 3 in Camden, Delaware. Sergeant Short received training in DUI enforcement whilst in the police academy and is certified in DUI detection and field sobriety testing. Sergeant Short estimated he has made more than 300 DUI arrests.

On February 12, 2009, Sergeant Short was working as part of a federal investigation in Sussex County. At approximately 4:41 p.m., Sergeant Short was operating an "unconventional" police SUV[5] that was stopped at a red light on Route 1 southbound in the area of Sea Air Mobile Home Park near Rehoboth Beach. In the lane next to Sergeant Short, a black Mitsubishi Lancer was stopped. Sergeant Short heard yelling from the Mitsubishi and observed the occupants shouting and bouncing around inside. Sergeant Short stated it looked like a "girls gone wild" video.

When the light turned green, the Mitsubishi accelerated from the light and "came up directly behind" a small grey car. According to Sergeant Short, the driver of the Mitsubishi was following the grey car too close, with only a foot between the vehicles, such that the grey car could not slow down without being hit from behind. Sergeant Short could not tell if the Mitsubishi was speeding. According to Sergeant Short, the Mitsubishi did not swerve within its lane. The Mitsubishi tailgated the grey car for approximately one-half mile. The grey car then made an abrupt lane change to apparently "get away from" the Mitsubishi.

After observing these actions, Sergeant Short decided to conduct a traffic stop of the Mitsubishi. Sergeant Short followed the Mitsubishi as it made a left turn across

northbound Route 1 without signaling, and turned into the parking lot of a restaurant. Sergeant Short blocked-in the Mitsubishi using his vehicle and activated his vehicle's emergency equipment.

Sergeant Short then approached the driver of the Mitsubishi, Lefebvre, and identified himself. Sergeant Short testified that he noticed a strong odor of an alcoholic beverage and that Lefebvre's speech was slurred. Lefebvre appeared visibly flustered and asked why she had been stopped. Lefebvre produced her license and registration as requested, although she reportedly had to be asked for her license more than one time. Sergeant Short could not observe Lefebvre's eyes because she was wearing sunglasses.

After speaking with Lefebvre, Sergeant Short returned to his police car and requested that a patrol unit respond to conduct field sobriety tests. Trooper Page was in his police car when he heard the dispatch request a patrol unit to respond to Sergeant Short's location to conduct field tests. Trooper Page responded and met with Sergeant Short, who briefed Trooper Page about his observations and belief that Lefebvre was under the influence. Sergeant Short advised Trooper Page that he had not yet conducted any field tests.

Trooper Page had been a Delaware State Police officer for two years. Before joining the State Police, Trooper Page served in the Air Force for thirteen years. Trooper Page received training in DUI enforcement in the police academy and was certified in DUI detection and field sobriety testing. Before February 12, 2009, Trooper Page estimated he had

---

**5.** Lefebvre described Sergeant Short's vehicle as a 2002 Chevrolet Avalanche with tinted windows which would not commonly be recognized as a police car by members of the general public.

made approximately twenty arrests for DUI offenses.

After speaking with Sergeant Short, Trooper Page approached the Mitsubishi and spoke to Lefebvre. Trooper Page testified that he noticed a strong odor of an alcoholic beverage and that Lefebvre's face was flushed. His entire interaction with Lefebvre was recorded on his patrol vehicle's dashboard camera, the video of which was admitted into evidence and played at the suppression hearing.

Trooper Page asked Lefebvre when she last had a drink. She responded an "hour and a half ago." No alcoholic beverages were visible in her vehicle. Lefebvre asked several times why she had been stopped. Trooper Page characterized Lefebvre as being argumentative, but not confused. Although the video reflects that Lefebvre's speech was understandable, Trooper Page testified that Lefebvre's speech was slurred. When questioned about this discrepancy, Trooper Page did not agree that the video accurately depicted Lefebvre's speech.

Although Trooper Page believed Lefebvre was impaired before he conducted any field tests, he nonetheless asked Lefebvre to perform field sobriety tests which Trooper Page testified, are designed to "show that [a] person is under the influence of alcohol by having them perform multiple tasks." Trooper Page first administered two pre-exit tests, the alphabet and counting tests, while Lefebvre remained seated in her car. She performed both tests correctly.[6]

Trooper Page then had Lefebvre exit her car for additional testing. Trooper Page testified that he is trained to observe DUI suspects as they exit their car for signs of impairment, such as staggering or using the car for balance. Trooper Page characterized Lefebvre's exit as normal.

Once Lefebvre was outside of her car, Trooper Page administered the horizontal gaze nystagmus test ("HGN"). Trooper Page testified about the general principles underlying the test, his training to administer the test and the six clues for which he checks. Although Trooper Page testified that Lefebvre exhibited all six clues, the Trooper did not conduct the test in accordance with National Highway Traffic Safety Administration ("NHTSA") protocol. Therefore, the Superior Court found that the results were compromised and did not consider them in determining whether probable cause existed.

After the HGN test, Trooper Page had Lefebvre perform a finger dexterity test. Trooper Page instructed Lefebvre to touch the tip of her thumb with the tip of each finger, counting, one, two, three, four, and then going back counting, four, three, two, one. This test requires the subject perform a total of sixteen actions (counting aloud eight times and touching the fingers eight times). Lefebvre was instructed to do this test twice with each hand. Trooper Page acknowledged that Lefebvre did well on the test.

Trooper Page next administered the walk-and-turn test. Lefebvre was instructed to stand with her right foot in front of her left. The video shows that Lefebvre held this position without issue

---

6. With respect to the alphabet test, Trooper Page instructed Lefebvre to recite the alphabet beginning with the letter E and ending with the letter P. The purpose of having a person start and end with a letter in the middle of the alphabet is to make the test harder by dividing the person's attention and giving them multiple tasks to think about. Lefebvre performed this test correctly. Trooper Page then instructed Lefebvre to count backwards beginning with the number 98 and ending with the number 87. Lefebvre performed this second divided attention test correctly.

for nearly a minute while Trooper Page explained the test. Lefebvre was instructed to walk nine steps forward heel-to-toe, and then pivot and take nine steps back heel-to-toe. Trooper Page concluded that Lefebvre passed this test.

Trooper Page then administered the one-leg stand test. Lefebvre was instructed to stand with her hands at her side, raise either foot six inches off the ground and then count to thirty by 1,000 (1001, 1002, 1003, etc.) until told to stop. Before the test, Lefebvre commented to Trooper Page that "I'm not that good at this sober." The videotape of Lefebvre's test shows that more than thirty seconds elapsed before Lefebvre began to sway. The Superior Court found as fact that Lefebvre did not begin to lose balance until after thirty seconds had elapsed. Thus, Lefebvre passed this test.

Finally, Trooper Page administered a portable breath test ("PBT") to Lefebvre. Although Trooper Page considered Lefebvre to have failed this test, Trooper Page did not follow proper protocol for administering the test and did not know if the machine had ever been calibrated. Consequently, the Superior Court held that the PBT results were compromised and did not consider the results in determining whether probable cause had been established.

After finishing the field testing, Trooper Page allowed Lefebvre to walk back to her car. He then went over to Sergeant Short, showed him the failed PBT results and said "she did well on her tests though." Sergeant Short responded by saying: "she's drunk, I could tell when I got up there." Trooper Page then returned to Lefebvre and placed her under arrest for DUI.

### Probable Cause Before Chemical Test

■ A person who operates a motor vehicle on a Delaware roadway is deemed by statute "to have given consent to chemical tests, including a test of the breath to determine the presence of alcohol or drugs."[7] Since that testing constitutes a search,[8] constitutional protections require a police officer to have probable cause to believe a person was driving while under the influence of alcohol or drugs before requiring the person submit to chemical testing.[9] "While under the influence" is defined in title 21, section 4177(c)(5) to mean that "the person is, because of alcohol or drugs or a combination of both, less able than the person would ordinarily have been, either mentally or physically, to exercise clear judgment, sufficient physical control, or due care in the driving of a vehicle."[10]

■ This Court has described probable cause as "an elusive concept which ... lies somewhere between suspicion and sufficient evidence to convict."[11] Probable cause to arrest for a DUI offense exists when an officer possesses "information which would warrant a reasonable man in believing that [such] a crime ha[s] been committed."[12] To meet this standard, police must "present facts which suggest, when those facts are viewed under the totality of the circumstances, that there is

7. *Bease v. State,* 884 A.2d 495, 497–98 (Del. 2005) (citing Del.Code Ann. tit. 21, § 2740(a)).

8. *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

9. *Bease v. State,* 884 A.2d at 498.

10. Del.Code Ann. tit. 21, § 4177(c)(5).

11. *State v. Maxwell,* 624 A.2d 926, 929 (Del. 1993).

12. *Clendaniel v. Voshell,* 562 A.2d 1167, 1170 (Del.1989) (citation omitted).

a fair probability" that the defendant has committed a DUI offense.[13] That hypothetically innocent explanations may exist for facts learned during an investigation does not preclude a finding of probable cause.[14] What is required is that the arresting police officer possess a "quantum of trustworthy factual information" sufficient to warrant a man of reasonable caution in believing a DUI offense has been committed.[15]

Whether probable cause exists to arrest a driver for a DUI offense is generally decided by the arresting officer's observations, which frequently include the quality of the driver's performance on field sobriety tests. Although no precise formula exists, the boundaries of what constitutes probable cause for a DUI offense have been defined and refined in a variety of factual contexts. For example, a traffic violation combined with an odor of alcohol, standing alone, do not constitute probable cause to arrest the driver for a DUI offense.[16] Conversely, as this Court held in *Bease*, evidence of a traffic violation, odor of alcohol, rapid speech, admission to drinking, bloodshot and glassy eyes and a failed alphabet test constituted probable cause to arrest the driver for a DUI offense.[17]

In *Perrera v. State*, the driver passed two field tests, finger-to-nose and one-leg stand, but had committed a traffic violation, smelled of alcohol, had bloodshot glassy eyes, failed the alphabet and counting tests, failed two PBT tests and failed the HGN test.[18] We held in *Perrera* that probable cause to arrest existed notwithstanding the two passed field tests.[19] This Court explained that "[m]ixed results in field sobriety tests do not extinguish probable cause if other sufficient facts are present." [20]

In this case, Lefebvre concedes that there was probable cause to arrest her for a DUI offense *before* any field test was administered. That concession appears on page 19 of Lefebvre's Opening Brief in this appeal, which states:

> The evidence supporting probable cause in the present appeal, in the light most favorable to the State, can be summarized as follows: Lefebvre committed a traffic offense, exhibited a strong odor of alcohol, had a flushed face and bloodshot, glassy eyes, admitted drinking an hour and a half before the stop, was somewhat flustered and argumentative with the officer, and stated prior to the one-leg stand "I'm not that good at this sober." Were this the only evidence in the case, or if Lefebvre had refused to perform field tests, defendant concedes that probable cause would have existed. Without anything more, the present case would be almost identical to *Bease*.

We agree with Lefebvre's acknowledgment that, in accordance with our holding in *Bease*, there was probable cause to arrest her for a DUI offense *prior* to the administration of any field sobriety tests.

Nevertheless, Lefebvre argues that the observations made by Sergeant Short and Trooper Page and any statements by Lefebvre must be considered together

13. *State v. Maxwell*, 624 A.2d at 930.

14. *Id.*

15. *Id.* at 931.

16. *Esham v. Voshell*, 1987 WL 8277 (Del.Super.Ct. Mar. 2, 1987).

17. *Bease v. State*, 884 A.2d at 499–500.

18. *Perrera v. State*, 2004 WL 1535815 (Del. June 25, 2004).

19. *Id.* at *1.

20. *Id.*

with the "overwhelming evidence of non-impairment" that was subsequently generated by her performance on the field tests. Specifically, Lefebvre notes that her speech was understandable and that she passed the alphabet test, passed the counting test, exited her car without issue, passed the finger-dexterity test, passed the walk-and-turn test and passed the one-leg stand test. Lefebvre emphasizes that this is not a case where the field tests results were "mixed" because she passed every field test properly administered by Trooper Page to determine whether she was impaired.

The Superior Court characterized Lefebvre's successful performance on the field sobriety tests as hypothetically "innocent explanations."[21] The State acknowledges that the walk-and-turn and one-leg stand are field sobriety tests which have been standardized and validated through extensive research studies sponsored by NHTSA.[22] Both tests employ the concept of divided attention. Lefebvre argues that passing two NHTSA certified field tests is not an "innocent explanation" but was proof of her non-impairment. In summarizing her argument, Lefebvre states:

> If successfully performing two NHTSA certified field tests constitutes nothing more than hypothetically "innocent explanations", then in effect the NHTSA tests are only relevant in a probable cause analysis when a person fails them. Such an interpretation of the tests is not supported by Delaware law or the scientific principles and validation studies by which the tests were developed.

Lefebvre argues that her having passed every properly administered field sobriety test (other than the HGN and PBT, which the Superior Court determined were not properly administered) constitutes "overwhelming evidence" that she was not impaired by alcohol. Lefebvre urges this Court to hold that her "success" on the field sobriety tests negated the facts that she concedes otherwise established probable cause to arrest her for DUI *before* the field tests were administered. To hold otherwise, she argues, would ignore the "totality of the circumstances" element of the probable cause standard, and render field sobriety testing relevant in a probable cause analysis only when a person fails the tests.[23]

To reiterate, Lefebvre concedes that based on the facts and circumstances, Trooper Page had probable cause to arrest her for a DUI offense *before* the field tests began. According to Lefebvre, however, probable cause, once established, may be negated by "overwhelming evidence of non-impairment produced through" non-failing performance on standardized field sobriety tests. Lefebvre's argument misconstrues the evidentiary weight of non-failing results on standardized field sobriety tests, insofar as those results pertain to the "totality of the circumstances" legal standard for determining probable cause to arrest for a DUI offense.

---

21. *State v. Maxwell,* 624 A.2d at 930. We do not agree with that characterization. Successful performances on field sobriety tests are not the type of conduct that we described as innocent explanations in *Maxwell.*

22. National Highway Traffic Safety Administration, *DWI Detection and Standardized Field Sobriety Testing,* Instructor's Manual, Session VIII, 2004 Edition, 2004 WL 5604664 (hereinafter "Session VIII") at § A.2.

23. Lefebvre's argument focuses on the walk-and-turn and one-leg-stand tests, which are two of three tests comprising the Standardized Field Sobriety Test battery ("SFST") developed and validated by the National Highway Traffic Safety Administration ("NHTSA"). The third SFST test is the HGN. See *http://www.nhtsa.gov/people/injury/alcohol/SFST/appendix_a.htm.*

■ Contrary to Lefebvre's contention, field sobriety testing is relevant to a probable cause analysis not only where a person fails them, but also where a person passes them and all other facts and circumstances known to the police officer before the field tests are *insufficient* in themselves to establish probable cause. For example, the commission of a traffic offense combined with an odor of alcohol, standing alone, do not constitute probable cause to arrest for a DUI offense.[24] Nevertheless, those two facts may give rise to a reasonable suspicion of DUI and justify a request that the driver perform some field sobriety tests. The driver's performance on those tests may give rise to facts that either elevate what was only a suspicion into probable cause, or dispel the suspicion and result in no DUI arrest.

■ Lefebvre's case is distinguishable because she concedes that there was not merely a suspicion *before* the field tests began, but actual probable cause to arrest her for a DUI offense. There are many factual scenarios where probable cause to arrest for a DUI offense is so clear that the driver is not asked to perform any field tests. But, even where (as here) a police officer has probable cause to arrest before any field testing, the officer is not precluded from developing additional evidence through field testing. When probable cause pre-existed, and the field tests and the performance results are either favorable to the driver or mixed, that evidence is available for a reasonable doubt argument to the trier of fact at trial, *if a BAC test is requested and refused.*

■ Field tests results that are either favorable to the driver or mixed, do not, however, negate the probable cause to arrest that existed before the field tests began. In other words, the performance

results of field sobriety tests may either eliminate suspicion or elevate suspicion into probable cause but they are of insufficient evidentiary weight to eliminate *probable cause* that had already been established by the totality of the circumstances before the performance of the field sobriety tests. The record reflects the Superior Court applied a proper totality of the circumstances analysis in deciding to deny Lefebvre's motion to suppress.

### *Response to the Dissent*

Lefebvre concedes that there was probable cause to arrest her for DUI *before* any field sobriety test was administered. The dissent asserts that " 'concession' by Lefebvre is not a fact, and that it should have no bearing on the probable cause determination." To the extent that Lefebvre's concession is simply an acknowledgement that is "in accordance with our holding in *Bease*," we agree. The record facts in this case support a finding of probable cause, prior to the administration of any field test, that is controlled by our holding in *Bease* and without any regard to Lefebvre's unsurprising concession. The dissent does not take issue with either the record facts or the holding in *Bease.*

The dissent asserts that after Lefebvre passed the *properly* administered field sobriety tests, Trooper Page appealed to Sergeant Short for guidance and "without much elaboration, Short replied she's drunk . . . ," implying that Page should arrest Lefebvre. Sergeant Short's statements must be considered in the context of the fact that Lefebvre failed a portable breath test (PBT). The dissent asserts that the failed portable breath test results should not be relied upon because it was excluded from evidence due to its improper administration. We do not rely upon it

---

**24.** *Esham v. Voshell,* 1987 WL 8277 at *2.

now for the truth of the excluded results but, rather, to put Sergeant Short's remarks into a complete context which is accurately related in the statement of facts in Lefebvre's opening brief in this appeal.

After finishing the field testing, Page allowed Lefebvre to walk back to her vehicle. He then walked over to Short, showed him the [failed] PBT and said "she did well on her tests though." Short responded by saying: "she's drunk, I could tell when I got up there." Page then walked over to Lefebvre and placed her under arrest for DUI.

The difference between the majority and the dissent on what the dissent describes as "segmenting" turns on the question of whether field sobriety tests that are either favorable to the driver or mixed, negate the probable cause to arrest that existed before the field tests began. The majority holds that they do not and the dissent argues that they can. In support of its position, the dissent notes that Lefebvre "successfully passed the walk-and-turn and one-leg stand tests while wearing high-heels." The dissent asserts that successful performance on field sobriety tests is of such great evidentiary weight that it can defeat the probable cause that preceded the administration of those tests. That assertion is not supported by NHTSA's own materials. NHTSA research has demonstrated that many impaired suspects can maintain balance while performing the one-leg stand for 20–25 seconds and a few can do so for the full 30 seconds it takes to complete the test.[25] As part of NHTSA's validation studies of the standardized field tests, the walk-and-turn test, by itself, was

found to be 68% accurate.[26] Similarly, the one-leg stand test, by itself, was found to be 65% accurate.[27] In other words, each of those tests had a margin of error that was either 32% or 35%.

The difference between the majority's and the dissent's proposed probable cause analysis is most clearly illustrated by the facts of this case. The majority holds that there was probable cause to arrest Lefebvre for a DUI offense before the field tests were conducted and that the pre-existing probable cause was not extinguished by her successful completion of those tests. Therefore (as the majority holds), the results of a correctly administered intoxilyzer test were properly admitted into evidence to prove that Lefebvre's blood alcohol concentration was .185.[28] The dissent concludes that following Lefebvre's successful performance on the field tests, there was no probable cause to arrest Lefebvre for a DUI offense. We cannot agree. This case demonstrates—consistent with NHTSA's own findings—that an individual may pass field tests and still be under the influence of alcohol. Lefebvre's blood alcohol concentration was more than two times greater than the legal limit (.08). Where probable cause exists independently of field tests which a person under the influence may pass, that probable cause is not extinguished by the successful performance of the tests.

### Conclusion

The judgment of the Superior Court is affirmed.

---

**25.** National Highway Traffic Safety Administration, *DWI Detection and Standardized Field Sobriety Testing,* Instructor's Manual, Session VII, 2004 WL 5604663 at § E.7.

**26.** Session VIII at § A.5.

**27.** Session VIII at § A.5.

**28.** The intoxilyzer test was properly administered at the police station separate and apart from the improperly administered portable breath test that was conducted at the scene.

STEELE, Chief Justice, and BERGER, Justice, dissenting:

The majority holds that there was probable cause to believe that Lefebvre was driving under the influence. It does so by relying on Lefebvre's concession, and by dividing the "totality of the circumstances" test into parts. But the "concession" is not a fact, and it should have no bearing on the probable cause determination. Moreover, by compartmentalizing the probable cause analysis, the majority uses a test that does not properly consider the "totality of the circumstances." We disagree with the majority's analysis of these issues, and we respectfully dissent.

The Court must have a principled basis for determining whether, as the majority puts it, an officer—presumably the officer who offers the breath test to the defendant—"possesses information which would warrant a reasonable man in believing that [such] a crime has been committed." [29] That information, of course, is designed to determine whether a person is "less able than the person would ordinarily have been, either mentally or physically, to exercise clear judgment, sufficient physical control, or due care in the driving of a vehicle." [30] As the majority points out, no one can be required to submit to chemical breath testing unless a police officer has probable cause to believe the person "was driving while under the influence" as defined above.

The "totality of the circumstances" test, as the majority acknowledges, is the proper test to decide whether probable cause exists. [31] That said, the test must be applied in a manner that considers all the information available and then fairly assesses that information. We agree with the majority on the fundamental approach, but we disagree with the majority's novel application of the test. The majority never considers all the admissible evidence *in toto*. Instead, it segments probable cause into temporal compartments based on the series of events that culminated in Lefebvre's arrest. We believe this segmented approach is a notable, and unwarranted, departure from our precedent. [32]

The majority suggests that passed field sobriety tests can be ignored under the "totality" test if, before testing, the police might have had sufficient alternative evidence to constitute probable cause. In doing so, the majority discounts the fact that experts specifically designed the field tests to provide objective evidence of one's ability to multitask, [33] which is a reliable indicator of impairment, or lack thereof. But the majority would balk at the suggestion that those same field tests should be

29. *Clendaniel v. Voshell*, 562 A.2d 1167, 1170 (Del.1989).

30. 21 *Del. C.* § 4177(c)(5).

31. *See Illinois v. Gates*, 462 U.S. 213, 230–31, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *State v. Maxwell*, 624 A.2d 926, 928 (Del.1993).

32. Indeed, in our survey of this Court's previous "totality of the circumstances" cases, it appears to us that this segmentation approach to "totality of the circumstances" is new. *See, e.g., Bease v. State*, 884 A.2d 495, 497, 499–500 (Del.2005) (considering all evidence available to the police at the time of probable cause determination, including (1) Bease's manner of speech, (2) smell of alcohol, (3) admission of consumption, and (4) bloodshot and glassy eyes, along with (4) his commission of a traffic offense, and (5) his failure of the alphabet test—the only NHTSA test the police administered properly); *Perrera v. State*, 852 A.2d 908, 2004 WL 1535815, at *1 (Del. June 25, 2004) (ORDER) (considering all evidence available to the police, including five failed field tests and two passed field tests, and holding that probable cause existed under the totality of the circumstances test).

33. The majority aptly refers to this as the "concept of divided attention."

ignored in cases where, lacking sufficient alternative evidence, the police rely on any adverse test results to establish probable cause.

We believe that the "totality" test, to be both fair and principled, must account for *all* conduct before the chemical breath test, along with hypothetically innocent explanations for those actions (*e.g.*, youths bounce around to loud music in cars, drivers follow too closely on occasion, and drivers fail to use turn signals for reasons completely unrelated to impairment by alcohol), in an evenhanded probable cause analysis. The majority correctly posits that the existence of "hypothetically innocent explanations" for facts does not preclude a finding of probable cause.[34] Indeed, it is established Delaware law that "hypothetically innocent explanations" cannot "discount[ ] the probative value of [ ] fact[s] revealed by the police investigation."[35] That does not mean, however, that the police or the Court may completely ignore "hypothetically innocent explanations," and give weight only to inculpatory explanations for the same facts. Under a true "totality" analysis, the police and the Court must consider all circumstances, and may not simply categorize any conduct that might be alcohol-induced as evidence of impairment.

First, while both officers testified they smelled the "odor of alcohol," Delaware law does not forbid driving with an "odor of alcohol" on one's breath. Besides, those familiar with experts' views know that ethanol itself is odorless and that the nature of the beverage consumed—not the quantity of alcohol consumed—affects the strength of the beverage's odor.[36] The quantity of alcohol consumed, not the beverage ingredient that supplies the odor, affects impairment. Ergo, the need for multitasking field tests in order to ascertain whether there is reason to believe a suspect may be impaired.

In this case, we have the additional anomaly of an arresting officer—Trooper Page—who, having been called to the scene of a stopped vehicle by Sergeant Short, never saw Lefebvre drive. Even the two officers' testimony conflicted, in part, over Lefebvre's demeanor, and the trial judge found that the video tape contradicted them both on the *de rigueur* "slurred speech" testimony. Short, a senior officer who observed the defendant drive for two minutes or less, called for Page to come to the scene in order to administer "field tests." Experts designed those tests specifically to augment subjective observations by providing results reflecting a driver's objective "multitasking" ability in order to determine whether the driver drove while impaired.

Lefebvre passed all properly administered NHTSA certified tests. That is, and should be recognized as, evidence of lack of impairment.[37] That this conclusion is so readily apparent becomes clear when the perplexed Page appealed to Short, who originally ordered him to conduct the definitive multitasking field tests, for guidance because the defendant actually

---

34. *Maxwell*, 624 A.2d at 930.

35. *Id.*

36. *See, e.g.,* Dr. David J. Hanson, Ph.D., DWI/ DUI Facts and Fiction: Urban Myths, ALCOHOL PROBLEMS AND SOLUTIONS (April 3, 2011, 4:00 PM), http://www2.potsdam.edu/ hansondj/DrivingIssues/1107196613.html.

37. Indeed, as the majority explains, Lefebvre passed *every* objective test that Page properly administered. This includes the alphabet, counting, walk-and-turn, one-leg stand, and finger dexterity tests. In fact, it merits notation that Lefebvre successfully passed the walk-and-turn and one-leg stand tests while wearing high heels.

showed no impairment when she passed the expertly designed tests. Without much elaboration, Short replied, "she's drunk ...," and implied that Page should arrest Lefebvre.[38] Short ordered the tests expecting Lefebvre to fail. When she did not, he disregarded them.

Although the trial judge and the majority give no credence to hypothetically innocent explanations for bouncing to music, momentarily tailgating, and failing to use a turn signal, they brush aside the unexpected passing of an entire series of multitasking field tests *specially designed to objectively reflect impairment* as if they were of no consequence. If one accounts for all appropriate hypothetically innocent explanations, and considers only the admissible evidence, then in our view, there was little basis to believe Lefebvre drove while impaired before being given the chemical breath test and, more practically, no probability that Short himself believed so when he ordered Page to give the field tests.

The majority bolsters its conclusion by relying on the assertion in Lefebvre's brief that probable cause existed before the administration of field tests. But, in fact, she premised that "concession" expressly on viewing all the evidence up to that point "in the light most favorable to the State." Neither the oral argument nor the record suggests any law that requires the evidence to be considered in the light most

favorable to the State at any stage of probable cause fact finding. Instead, for probable cause to exist, as the majority quotes our precedent, police must "present facts which suggest, when those facts are viewed under the totality of the circumstances, that there is a fair probability that the defendant committed a DUI offense." [39]

Without record support, the majority asserts that "there are many factual scenarios where probable cause to arrest for a DUI offense is so clear that the driver is not asked to perform any field tests." Clearly, this case is not one of them.[40] Nevertheless, the majority publishes a holding that will stand for the proposition that field tests, designed and given to prove impairment, when passed, are irrelevant to probable cause determinations as long as the police already have other evidence which, when considered in isolation, may constitute probable cause. On the other hand, the State presumably may continue to use unfavorable field test results in building its case for probable cause. We find this "heads-I-win, tails-you-lose" framework inappropriate under existing law.

We cannot find any precedent to support the majority's segmented approach to the "totality of the circumstances" test, and the majority cites none.[41] In nearly all of

---

**38.** The majority explains this interaction between the two officers by saying that Lefebvre failed the breath test. But a court cannot consider inadmissible evidence. The breath test was administered improperly. As a result, the test results are meaningless.

**39.** *Maxwell,* 624 A.2d at 930.

**40.** Even assuming the majority assertion is correct, we would not hold that field testing is a necessary condition to a finding of probable cause. We would hold only that the Court must consider the favorable results of field testing, like that performed in this case, along

with all other available evidence, as part of its "totality of the circumstances" analysis. Controlling precedent very clearly considers failed field test as part of its "totality of the circumstances" analysis, *see supra* note 4, and we should consider passed field test similarly.

**41.** *See supra* note 4. *See also Maxwell,* 624 A.2d at 930 (considering all evidence available to the police, along with the police "observations, their training, their experience, their investigation, and *rational inferences drawn therefrom*") (emphasis added); *Clendaniel v. Voshell,* 562 A.2d 1167, 1170 (Del. 1989) (considering all evidence available to

the cases the majority cites, this Court considered field test results.[42] None of the cases, however, featured facts quite like those in the immediate case, where the defendant passed all properly administered tests. In fact, of all the "totality" cases the majority cites, only one—*Perrera*—ever considered the mitigating effect of passed field tests. In that case, the Court considered the import of the passed tests, but determined, on the totality of the circumstances, that there was probable cause because the five failed tests and other subjective evidence outweighed the two passed tests.[43]

The other cases the majority cites did not consider passed field tests, but not because the Court segmented the evidence, or ignored the tests. The Court did not consider the passed tests because they were improperly administered. Defendants in those cases failed each properly administered field test, and the Court did consider the failed tests as part of its "totality" analysis. The immediate case is clearly different, since Lefebvre passed all properly administered tests. According to the "totality of the circumstances" approach of our precedent, then, we should ascribe significance to these passed tests and consider them alongside all other available evidence when determining probable cause.

We believe the majority's new approach sends an unmistakable message to the police that in order to achieve probable cause, they need not consider a balance, but a scale; rather than step back and weigh all the evidence of impairment against evidence of no impairment, as a faithful "totality" test should, they can simply consider evidence suggesting impairment, count up, and then cut the inquiry off once they have passed the threshold for probable cause.

The majority's holding here reserves successful field test results for assertions of innocence where defendants refuse a chemical breath test. The holding, as a practical matter, makes field test results inconsistent with impairment inadmissible for probable cause determinations because there could be hypothetical "innocent" explanations for passing, while innocent explanations for careless driving may not be considered part of the mix. We consider this a truly extraordinary result.

In our view, a proper application of a totality of the circumstances test leads to only one conclusion in this case—consideration of all the facts does not suggest that there was a "fair probability" that the defendant committed a DUI offense before being required to submit to a chemical breath test. We cannot agree with the majority's analysis or with its conclusions, and we respectfully dissent.

---

the police in determining probable cause, which included "a series of field sobriety tests, [all of] which Clendaniel performed poorly.").

**42.** *See supra* note 12. The sole exception appears to be *Maxwell*, and in that case there

is no suggestion that the police administered any field tests at all.

**43.** *Perrera*, 2004 WL 1535815, at *1.