# IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,               )
                                 )
    Plaintiff,             )
                                 )
    v.                     )    C.A. No.: 2504002261
                                 )
GRACE DAVIS,                     )
                                 )
    Defendant.             )

Submitted: January 8, 2026
Decided: February 11, 2026

## MEMORANDUM OPINION AND DECISION ON DEFENDANT'S MOTION TO SUPPRESS (DUI CASE)

Joseph Lafferety, Esq. *Deputy Attorney General.*

John S. Malik, Esq. *Defense Counsel—Grace Davis.*

**Manning, J.**

## Introduction

On April 5, 2025, Grace Davis (Davis), was arrested for the offense of Driving Under the Influence ("DUI") and other traffic violations.[1] Davis has filed a Motoin to Suppress, pursuant to Court of Common Pleas Criminal Rules 12(b) and 41(f). Davis moves this Court to exclude Intoxylizer evidence obtained from her person, arguing that there was no reasonable suspicion to conduct a DUI investigation, there was no probable cause to arrest her, and ultimately, the Intoxylizer was administered improperly, invalidating its result.

On October 29, 2025, a hearing on the Motion was held. Following testimony from the arresting officer and a review of relevant Body Worn Camera ("BWC") videos, I ruled on the record that there was reasonable suspicion for officers to conduct a DUI investigation, and that the Intoxilyzer test, despite some difficulty, was properly administered and valid. I reserved decision as to whether there was probable cause to arrest to arrest Davis. At the conclusion of the hearing, the parties were given the opportunity to submit supplemental briefing on the issue.

---

[1] Failure to Obey an Authorized Person Directing Traffic in violation of 21 Del. C. § 4103; Inattentive Driving in violation of 21 Del. C. § 4176; Failure to Obey Traffic Control Devices Designating Lane in violation of 21 Del. C. § 4122; Failure to have Insurance Identification in Possession in violation of 21 Del. C. § 2118; and Driving with Expired Registration in violation of 21 Del. C. § 2115.

2

# FACTS

Just after midnight on April 5, 2025, Delaware State Police ("DSP") officers responded to a fatal hit-and-run accident on Augustine Cut Off, between Cantera Road and Alapocas Drive, in North Wilmington, Delaware. To preserve the crime scene and prevent traffic from interfering with its investigation, DSP positioned one of its marked vehicles diagonally, across both lanes of travel, with its emergency lights activated. However, the vehicle was oriented such that it only blocked the north-bound and south-bound lanes; it did not block either shoulder, and no DSP officers were positioned near the parked vehicle to direct approaching traffic away from the crime scene.

At approximately 12:43 A.M., Davis, who was operating a Kia sedan and traveling north bound on Augustine Cut Off towards Cantera Road, reached the DSP vehicle. According to all accounts and DSP BWC video, Davis—followed by two other vehicles unrelated to this case—slowly proceeded past the DSP vehicle on the shoulder of the north bound lane. Davis traveled approximately 50-75 feet past the DSP vehicle before she was intercepted by DSP Sgt. Scarmazza and DSP Cpl. Link. Sgt. Scarmazza ordered Davis to stop and directed the two vehicles behind Davis, which were also traveling on the shoulder, to turn around, while Cpl. Link began interacting with Davis, who had rolled her window down to speak with the officers.

Cpl. Link informed Davis that she had driven into a crime scene and instructed her to back her vehicle up several feet. She then moved the car as instructed and Cpl. Link had Davis exit the vehicle and follow him several feet behind the trunk of the car, where he began to investigate her for a possible DUI. Cpl. Link explained that because he smelled alcohol and observed Davis's eyes to be "bloodshot" and "glassy," he felt it necessary to conduct further investigation into her ability to drive.

Cpl. Link asked Davis where she was coming from, and Davis responded that she had been at Trolley Tap House. Cpl. Link inquired about whether Davis had any drinks, and Davis stated that she had one drink, about an hour and a half to two hours prior. Cpl. Link then told Davis that he could smell the alcohol, and that he wanted to conduct several tests to ensure that Davis would be able to complete her drive home. Davis agreed to participate in the field testing.

Cpl. Link conducted the National Highway Traffic Safety Administration (NHTSA)[2] Standardized Field Sobriety Tests ("SFSTs") on Davis. First, he administered the Horizontal Gaze Nystagmus ("HGN") test, during which he observed Davis to exhibit two of six possible clues. Next, Davis performed the Walk and Turn test, where Cpl. Link stated he observed Davis to exhibit, what he considered to be two of eight possible clues; and in addition to the clues observed,

---

[2] The National Highway Traffic Safety Administration (NHTSA)—part of the U.S. Department of Transportation—utilizes a system where officers analyze a series of possible clues that indicate a suspect's level of impairment

4

Cpl. Link stated that Davis did not perform the Walk and Turn test as instructed, and instead walked in what he described as a "normal" manner. Third, Davis performed the One Leg Stand test, where Cpl. Link observed her to exhibit three of four possible clues. Finally, Cpl. Link conducted the Preliminary Breath Test ("PBT"), where Davis's results indicated that her blood alcohol level was 0.164%. At this point, Cpl. Link placed Davis under arrest and transported her to DSP Troop One to undergo Intoxilyzer testing.

Just after 2:00 A.M. that same morning, Cpl. Link administered the Intoxilyzer 9000 test on Davis, which, after one failed attempt, indicated a blood alcohol concentration over 0.08%.

## PARTIES' CONTENTIONS

The State argues that under the totality of the circumstances, the facts obtained through Cpl. Link's investigation were sufficient to conclude that there was probable cause to arrest Davis for DUI. These facts included: Cpl. Link's observations that Davis drove past a marked DSP vehicle blocking the road, an admission to having consumed an alcoholic beverage about an hour earlier, that Davis smelled of alcohol, had glassy and bloodshot eyes, and her performance on the field sobriety tests.

Davis argues that when considering the totality of the circumstances, no probable cause existed to arrest her and administer the Intoxilyzer test because she "passed" two out of three of the field tests, spoke clearly, did not exhibit bloodshot

or glassy eyes on the BWC video, and was not involved in a vehicle collision or serious moving violation prior to the traffic stop.

## LEGAL STANDARD

To defeat a motion to suppress for a warrantless DUI arrest, "the State must establish, by a preponderance of the evidence, that a defendant's arrest was supported by probable cause."[3] To meet its burden and satisfy the probable cause standard for a DUI arrest, the State must present facts which suggest, when "viewed under the totality of the circumstances, there is a fair probability that the defendant committed a DUI offense."[4] "This totality consideration is based on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act,'"[5] and the Court must review and analyze the facts of each case based "upon what the arresting officer knew at the time the decision was made to take the defendant into custody."[6]

## DISCUSSION

As noted above, I already ruled on the record that there was sufficient reasonable suspicion to detain Davis and ask her to perform field sobriety tests. I also ruled that the Intoxilyzer test performed on Davis was properly administered;

---

[3] *State v. Peterson*, 2018 WL 1801260, at *3 (Del. C.P. Apr. 16, 2018) (citing *State v. Anderson*, 2010 WL 4056130, at *3 (Del. Super. Oct. 14, 2010).
[4] *Lefebvre v. State*, 19 A.3d 287, 293 (Del. 2011).
[5] *Id.* (quoting *State v. Cardona*, 2008 WL 5206771, at *3 (Del. Super. Dec. 3, 2008)).
[6] *Lefebvre*, 19 A.3d at 293.

meaning that the Intoxilyzer result is admissible on the condition that Davis's arrest was supported by probable cause. Accordingly, this decision will focus solely on the issue of whether Cpl. Link had sufficient probable cause to arrest Davis after conducting SFSTs.

**A. Standardized Field Sobriety Tests**

NHTSA's SFSTs are the proverbial "gold standard" and provide police officers with objective and scientifically validated criteria to utilize when evaluating a driver suspected of DUI. NHTSA claims that when the field tests are "administered in the prescribed and standardized manner," the combination of the three tests boast accuracy ratings of between 86-95%[7] in determining whether a driver's blood alcohol concentration is above 0.08% ("the legal limit").[8] However, this validation of the field tests applies only when "[t]he tests are administered in the prescribed, standardized manner . . . [i]f any one of the [SFSTs'] elements are changed, the validity may be compromised."[9] Courts in this jurisdiction have not held that failure to strictly comply with NHTSA guidelines per se invalidates SFSTs,

---

[7] For the three separate studies, the tests accuracy ratings were 86% in Colorado, 95% in Florida, and 91% in San Diego. *See* National Highway Traffic Safety Administration, *DWI Detection and Standardized Field Sobriety Testing Refresher Instructor Guide* (Revised 2023), https://www.nhtsa.gov/sites/nhtsa.gov/files/2024-09/16412-2023_SFST_Refresher_Instructor_Guide-tag.pdf at 9.

[8] Accuracy ratings based on NHTSA Field Validation Studies of Standardized Field Sobriety Tests in Colorado, Florida, and San Diego. *See Id.* At 9. On their own, the HGN test has an accuracy rate of 88% in determining whether a driver's BAC is above 0.08%; the Walk and Turn test 79% accurate; and the One Leg Stand test 83% accurate. *See Id.* At 33; 43; and 50.

[9] *Id.* At 125.

but a sufficient deviation from NHTSA guidelines will diminish the reliability of the SFSTs to the point of invalidation.[10]

It is worth noting that although counsel in the present case, and indeed many other courts, often use "pass/fail" language to refer to performance on SFSTs, NHTSA does not utilize such terminology. In fact, NHTSA specifically states that "the SFSTs are a tool to assist [officers] in seeing visible signs of impairment and are not a pass/fail test."[11] NHTSA identifies a preset number of "clues" for each SFST that corresponds with a *likelihood* that a suspect's blood alcohol concentration is above the legal limit. Specifically, on the HGN test, four or more clues indicates a blood alcohol concentration at or above the legal limit with an 88% accuracy rate; on the Walk and Turn test, two or more clues indicates a blood alcohol concentration at or above the legal limit with a 79% accuracy rate; on the One Leg Stand test, two or more clues indicates a blood alcohol concentration at or above the legal limit with an 83% accuracy rate.[12] Notably, NHTSA does not state what, if any, likelihood of

---

[10] *See State v. Dale*, 2016 WL 691445, at *3 (Del. Super. Ct. Feb. 11, 2016) ("Although failure to strictly adhere to NHTSA requirements does not necessarily invalidate the test, the deviation from the fifteen-minute requirement in this case is so severe that the Court will not consider the PBT results."); *see also State v. Solanki*, 2019 WL 5858195, at *3 (Del. C.P. Nov. 8, 2019) (quoting *State v. Reilly*, 2018 WL 7049372, at *3 (Del. C.P. Nov. 30, 2018) ("[S]ufficient deviation from the NHTSA guidelines can diminish FSTs reliability.").

[11] National Highway Traffic Safety Administration, *DWI Detection and Standardized Field Sobriety Testing Instructor Guide*, (revised 2/2023), https://www.nhtsa.gov/sites/nhtsa.gov/files/2023-03/15911-SFST_Instructor_Guide_2023-tag.pdf at 57.

[12] *Id.* At 329; 340; and 348.

impairment is present if a test subject displays *less* than the number of clues noted above.

In the present case, Davis exhibited only two clues on the HGN. Although it is incorrect to call this a "passing score," it is significantly below the four or more clues that correspond with a high likelihood of intoxication. Because NHTSA does not state a possible level of intoxication nor a probability of impairment for a subject only displaying two clues, I cannot give the test any weight.

On the Walk and Turn test, Cpl. Link noted two out of eight clues. Specifically, Davis failed to touch heel-to-toe on both sets of nine steps (i.e. both the up and back) which he counted as two clues. However, NHTSA only recognizes the failure to touch heel-to-toe as one clue, no matter how many times it may occur. Thus, under NHTSA guidelines, Davis exhibited only one clue, which is below the NHTSA designated threshold for this test.

The State contends that although Davis scored only one (or two) clues out of eight, Cpl. Link noted in his report that Davis, "walked normally," meaning she did not properly follow the "heal-to-toe" instructions, and therefore this test should weigh against Davis. However, I am not persuaded after reviewing the BWC video. The NHTSA guidelines specifically identify failing to touch heal-to-toe as one clue,[13] and therefore it appears that the proper scoring under the NHTSA guidelines

---

[13] *Id.* At 266.

is only one out of eight clues. As with the HGN, because NHTSA does not state a possible level or probability of impairment for a subject displaying only one clue, I cannot give this test any weight.

Finally, as for the One Leg Stand test, Davis exhibited three out of four possible clues. This testimony is borne out by the BWC video which shows Davis hopping, swaying, and put her foot down prematurely.

As discussed above, NHTSA standards indicate that a score of two out of four clues corresponds with an 83% accuracy rate that a suspect's blood alcohol content will exceed the legal limit.[14] In her motion, Davis opined that she did technically balance for a total of 30 seconds. However, I consider this contention irrelevant, because even if I were to assume arguendo that she had balanced for the full continuous 30 second period and not put her foot down prematurely, she still swayed and hopped multiple times; giving her two out of four clues, which equates to the NHTSA standard discussed above.

## B. Portable Breath Test

To admit a PBT into evidence at a suppression hearing, Delaware law requires the State to "lay a proper foundation, by establishing that the police officer properly calibrated the PBT machine, and that the officer had been trained to operate the

---

[14] Additionally, the NHTSA SFST Refresher Manual states that "based on research, if an individual shows two or more clues or cannot complete the OLS, there is a *good chance* the BAC is at or above 0.08%." See *Id.* At 66.

test."[15] NHTSA operating procedures require trained officers to observe a suspect for a period of at least 15 minutes before administering the PBT.[16]

In the present matter, it is undisputed that Cpl. Link did not observe Davis for the full 15 minute period of time.[17] As this Court has previously held, "'any question as to the PBT's proper foundation may only go to the weight placed on the test result, rather than its admissibility.'"[18] The 15 minute observation period is necessary for a reliable BAC reading because it allows time for any residual alcohol in the mouth (from drinking, burping, or vomiting) to dissipate, ensuring that a breath sample comes from lung air, thus measuring actual blood alcohol concentration rather than possible recent mouth alcohol contamination.[19]

Because it is undisputed that Cpl. Link did not continuously observe Davis for the requisite 15-minute period, I am not satisfied that a proper foundation was

---

[15] *State v. Mendez-Garcia*, 2019 WL 5295566, at *4 (Del. C.P. Oct. 16, 2019), aff'd, 2020 WL 4251760 (Del. Super. Ct. July 24, 2020) (quoting *Miller v. State*, 4 A.3d 371, 374 (Del. 2010)).

[16] *See Dale*, 2016 WL 691445, at *3 ("Standard procedure for administering the PBT requires a fifteen-minute observation period before the test is performed.").

[17] Davis argues that the PBT results are "invalid and should not be considered in determining probable cause;" and the State concedes that "the required time limit for the PBT was not established . . . under this Court's precedent, the results of the PBT is likely to be given 'little weight' in the probable cause analysis.")

[18] *State v. Beheler*, 2010 WL 2195978, at *4 (Del. C.P. Apr. 22, 2010) (quoting *State v. Blake*, 2009 WL 3043964 at *4 (Del. C.P. Sept. 14, 2009).

[19] *See* National Highway Traffic Safety Administration, *DWI Detection and Standardized Field Sobriety Testing Participant Manual*, (Revised 2/2023), https://www.nhtsa.gov/sites/nhtsa.gov/files/2023-03/15911-SFST_Participant_Manual_2023-tag.pdf. At 21. ("It takes approximately 15 minutes for the residual alcohol to be eliminated from the mouth. The only sure way to eliminate this factor is to make sure the subject does not consume any alcohol for at least 15 to 20 minutes before conducting a breath test. . . do not permit the subject to put anything in their mouth for at least 15 to 20 minutes prior to testing").

established for the reliability of the PBT reading and therefore will not consider the results in making this ruling. [20]

### C. Cpl. Link's Observations

Davis told Cpl. Link prior to participating in the SFSTs that she had consumed an alcoholic beverage about an hour and a half to two hours prior. Cpl. Link testified at the hearing that he could smell alcohol on Davis's person and noted her eyes as "bloodshot and glassy." These factors went into his analysis and the State asserts that I should also consider them in my totality of the circumstances analysis.

The BWC video captured this entire investigation in near high-definition clarity. The BWC shows that Davis was cooperative, polite and did not appear to stagger, stumble or fall while walking and otherwise engaging with the officers that night. If Davis exhibited "glassy eyes" cannot be discerned in the BWC, however, the testimony that she has "bloodshot eyes" is not supported by the BWC video. During administration of the HGN test Davis's eye are clearly visible. Upon my review of the BWC video, the sclera of Davis's eyes appears to be white and free of any redness typically associated with being "bloodshot." Therefore, my analysis

---

[20] *See Dale*, 2016 WL 691445, at *3 (Where the officer observed the suspect for a period of approximately eight minutes, the Court stated: "[a]lthough failure to strictly adhere to NHTSA requirements does not necessarily invalidate the test, the deviation from the fifteen minute requirement in this case is so severe that the Court will not consider the PBT results"); *see also State v. Bell*, 2015 WL 1880591, at *2 (Del. C.P. Apr. 23, 2015) ("[The] Court found that, because Corporal Martinez could not have properly observed Bell for the required fifteen-minute observation period, the PBT was inadmissible.").

12

will only consider as fact Davis's admission that she had consumed an alcoholic beverage earlier in the night, smelled of alcohol, and had glassy eyes.

## Totality of the Circumstances Analysis

The State argues that I should consider the present matter analogous to *Miller v. State*.[21] In *Miller*, the defendant had (1) driven her car into another car stopped at a red light, (2) appeared to have glassy eyes and a strong odor of alcohol on her breath, (3) admitted to consuming two beers approximately two hours earlier, (4) performed on the field tests in such a way as to score at or above the number of clues which would indicate a high likelihood of intoxication on all three tests, and (5) blew above a 0.08 on the PBT.[22] The court in that case did not consider the defendant's performance on the HGN test or the PBT because proper procedure was not followed, however, it stated that even when excluding the results from the PBT and the HGN, "the alcoholic odor from two or three feet away, glassy watery eyes, failed[23] walk-and-turn and one-legged standing tests, and Miller's admission of having consumed two beers about two hours before sufficiently supported probable cause that Miller drove under the influence of alcohol."[24]

---

[21] *Miller v. State*, 4 A.3d 371 (Del. 2010).
[22] *Miller* 4 A.3d 371 at 372-74.
[23] Though I disagree with the terminology used, I will maintain the integrity of the quote.
[24] *Id.* 374–75.

13

However, in coming to this conclusion, the Supreme Court cited both *Bease v. State*[25] and *State v. Maxwell*,[26] both of which involved elements absent from this case. In *Bease*, the Supreme Court "held that the commission of a traffic offense, odor of alcohol, bloodshot glassy eyes, rapid speech, and the defendants' admission to drinking alcohol were sufficient to establish probable cause,"[27] In *Maxwell*, the Supreme Court "held that an accident, alcoholic odor, admitted alcohol consumption, and the Defendant's dazed appearance constituted probable cause."[28]

The present matter is missing an element that was present in *Miller*, *Bease*, and *Maxwell*—a serious traffic offense or accident. Here, Davis did not cause an accident and the traffic offenses she was cited for (excluding the DUI) are not, in my opinion necessarily indicative of impairment.[29] The traffic offenses Davis was cited for involve her slowly driving past the DSP vehicle on the shoulder of the road in an attempt to get to her neighborhood which was a very short distance up the road. Given a similar roadblock (notably one without any DSP officers actually directing traffic), it is probable that most reasonable people would have made the same

---

[25] *Bease v. State*, 884 A.2d 495 (Del. 2005).
[26] *State v. Maxwell*, 624 A.2d 926 (Del. 1993).
[27] *Miller* 4 A.3d 371 at 375 (Del. 2010) (citing *Bease*, 884 A.2d 495) (emphasis added).
[28] *Miller* 4 A.3d 371 at 375 (Del. 2010) (citing *Maxwell*, 624 A.2d 926) (emphasis added).
[29] In *Bease*, where the Court ruled there *was* sufficient trustworthy information to conclude that probable cause to arrest existed, the arresting officer observed the defendant "abruptly travel from the right straight lane into the turn lane for Interstate 95, forcing multiple vehicles that were already in that lane to rapidly decelerate," and then cross "the solid white line, which is not designated for lane deviation, and into the right travel lane for Interstate 95." *Bease* 884 A.2d at 496-97.

decision after some hesitation. I am therefore not convinced that Davis's actions in the present case are akin to a traffic offense indicative of impairment or causing an accident, and therefore I do not find this case analogous to *Miller*.

The Defense argues that I should find the present case analogous to *State v. Mulholland*.[30] However, I find *Mulholland* inapplicable in light of the fact that this Court excluded or gave no weight to all three SFSTs because they were improperly administered. In *Mulholland*, the only evidence of the defendant's intoxication (other than the SFSTs) consisted of a minor traffic violation, admission to drinking earlier in the day, odor of alcohol, and bloodshot eyes.[31] This Court held that considering the defendant's "coherent appearance, good speech, passing alphabet test, and other actions," her "minor weaving within lanes, odor of alcohol, bloodshot eyes at midnight, and admission to drinking at funeral earlier in the day" were insufficient to establish probable cause that she was driving under the influence of alcohol.[32]

Nevertheless, because no two DUI cases are exactly alike, each will turn on its specific facts, making comparisons instructive, but not determinative.

---

[30] *State v. Mulholland*, 2013 WL 3131642 (Del. C.P. June 14, 2013).
[31] *Id.* at *6.
[32] *Id.* at *5.

## CONCLUSION

This is a decidedly close call as to probable cause. Considerable evidence mitigates in Davis's favor. However, there is undeniable evidence that Davis consumed alcohol, and a fair probability existed that it impaired her ability to drive or put her over a BAC of 0.08%. But for her performance on the One Leg Stand Test, I would not find probable cause. However, when viewing the totality of the evidence, I find the facts established that there was probable cause to arrest Davis for DUI by a preponderance of the evidence.

Accordingly, Davis's Motion to Suppress is hereby **DENIED** and the matter shall proceed to trial.

**It is so ordered**, this 11th Day of February 2026.

Bradley V. Manning,
Judge

16