# IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE )
)
v. ) Cr.A. No.: 1309010262
)
)
)
MICHAEL W. ZAPPA, )
)
Defendant. )
)

Katherine Butler, Esquire
Department of Justice
820 N. French Street, 7th Floor
Wilmington, DE 19801
*Attorney for the State of Delaware*

Louis B. Ferrara, Esquire
Ferrara & Haley
1716 Wawaset Street
Wilmington, DE 19806
*Attorney for Defendant*

## DECISION AFTER TRIAL

**RENNIE, J.**

On September 14, 2013, Michael Zappa ("Defendant") was arrested and charged with Driving Under the Influence of Alcohol ("DUI"), in violation of 21 *Del. C.* § 4177. Defendant challenged the legality of the arrest and moved to suppress all evidence proffered by the State.

The Court held a suppression hearing over the span of three days. The hearing began on December 15, 2015 and continued on January 29, 2016. At the January hearing, Defendant moved for a mistrial after the State attempted to elicit certain testimony regarding Defendant's performance on the Intoxilyzer. Ultimately, the Court found that Defendant's motion for a mistrial was procedurally improper, treated it as an objection to the State's line of questioning, and sustained the objection.[1] On June 13, 2016, the suppression hearing continued, and the Court concluded that the arrest was supported by probable cause.[2]

Immediately following the suppression hearing, the Court held a non-jury trial. At the conclusion of trial, the Court reserved its decision. This is the Court's final decision after trial.

## FACTUAL BACKGROUND

### A. The Suppression Hearing

During the suppression hearing, the Court heard testimony from Corporal Megan Hazzard ("Corporal Hazzard"), Trooper Christopher A. Jewel ("Trooper Jewel"), Corporal Heidi Carroll ("Corporal Carroll"), and Trooper Jenny Gliem ("Trooper Gliem") (collectively, the "Troopers"), each of whom were involved in either the traffic stop or subsequent arrest of Defendant. The Court also viewed a copy of Corporal Hazzard's Motor Vehicle Recording ("MVR"), which captured Defendant's behavior during the stop. In addition, Defendant took the stand and testified on his own behalf. The Court finds the facts as follows:

---

[1] *See State v. Zappa*, 2015 WL 1399336 (Del. Com. Pl. Apr. 8, 2016).
[2] The Court informed the parties that it would issue a written decision following trial, which would include the Court's reasoning for its finding of probable cause.

2

### i.   *The Initial Stop at the Charcoal Pit*

On September 14, 2013, at approximately 10:20–10:30 p.m., Corporal Hazzard was on patrol in North Wilmington operating a fully marked Chevrolet Tahoe (the "Tahoe"). While stopped at a red light at the intersection of Concord Pike and Garden of Eden Road, Corporal Hazzard heard the screeching of tires coming from a car. The car quickly rounded the bend of Silverside Road and merged onto Concord Pike, traveling southbound. Corporal Hazzard activated her emergency lights[3] and attempted to catch up to the vehicle. The vehicle was traveling at a high speed and weaving in and out of traffic.[4] Eventually Corporal Hazzard caught up with the vehicle when it stopped at a red light at The Charcoal Pit ("The Pit"). When the driver of the vehicle did not react to the emergency lights, Corporal Hazzard activated her siren. The driver failed to react to the sound of the siren so Corporal Hazzard yelled out of her window and instructed the driver to pull over. This prompted the driver to move his vehicle forward about one foot. Corporal Hazzard sounded her air horn and the driver moved forward another foot. At that point, Corporal Hazzard pulled over to the left of the vehicle and instructed the driver to pull over into The Pit parking lot. Defendant obliged and turned into the parking lot.

Corporal Hazzard then approached the vehicle, identified Defendant as the driver, and observed one passenger sitting in the front seat. Upon her initial contact with Defendant, Corporal Hazzard observed Defendant to look dazed with "glazed over" eyes and not fully alert. She also smelled a strong odor of alcohol emanating from Defendant's breath. Corporal Hazzard told Defendant to hand over the keys to his vehicle. Defendant complied and Corporal Hazzard

---

[3] When Corporal Hazzard activated her emergency equipment, the MVR automatically activated.
[4] Corporal Hazzard testified that she was unable to see whether the driver of the vehicle was traveling within his lane or whether he utilized his driving signals, however, based on her familiarity of Concord Pike, she was able to determine that he was travelling faster than the posted speed of 40mph.

placed the keys on top of the car. When Corporal Hazzard asked Defendant if he knew why she stopped him, Defendant slurred his speech and was incomprehensible.

Corporal Hazzard then asked Defendant for his license and registration. While retrieving these documents, Defendant asked Corporal Hazzard, "Are you military friendly?" Corporal Hazzard responded, "Not if you're blitzed. What does that have to do with anything?"[5] That prompted her to ask Defendant a number of questions about his whereabouts and driving. Defendant stated that he was coming from La Tolteca, where he consumed alcohol, and was driving home to his apartment.[6] Eventually, Defendant handed the documents to Corporal Hazzard and stated that he did not live at the address listed on the vehicle's registration. He explained that he lived in an apartment in Rodney Square, and stated "You know, where the old courthouse was . . . my dad's law firm is there . . . if you get hurt, he can help you." Corporal Hazzard then asked Defendant, "Why were you driving like that?" Defendant responded, "I don't know why . . . I'm a United States Marine. I don't mean to disrespect you right now. I mean no disrespect." In response, Corporal Hazzard said to Defendant, "Don't say you are a service member . . . you're not acting like a Marine should [be acting]." At that point, the passenger—Defendant's then-girlfriend—became highly emotional and interrupted the conversation in an attempt to talk with Corporal Hazzard. Defendant told his girlfriend, "Stop, stop, stop. Please. No, no no," while putting his hand up. Corporal Hazzard asked Defendant to step outside of the vehicle and Defendant responded, "Ok. I will. Absolutely." Before Defendant stepped out of the vehicle, the girlfriend again attempted to talk to Corporal Hazzard and was in a highly emotional state. Defendant shook his finger at her and said, "No. Stop talking."

---

[5] Corporal Hazzard testified that she felt threatened by that question, found it to be unusual, and believed that Defendant was trying to "get out of getting a ticket."

[6] Defendant testified that his passenger had alcohol in the vehicle.

4

Defendant exited his vehicle and immediately placed his hands on the driver's side of the car. He then indicated to Corporal Hazzard that he did not have any weapons, specifically stating, "I have nothing. You can search me." At that moment, the girlfriend got out of the vehicle and began talking over Defendant and Corporal Hazzard, both of whom told the girlfriend to get back in the car. When the girlfriend did not listen to either Corporal Hazzard or Defendant, Defendant yelled, "Get back in the car . . . You are not helping." Then with one hand, Defendant gestured for the girlfriend to get back into the car. After the girlfriend went back inside the vehicle, Corporal Hazzard asked Defendant to place his hand behind his back so that she could apply handcuffs. He apologized and immediately placed his hand behind him. When Corporal Hazzard asked why Defendant was yelling at the girlfriend, Defendant stated, "She just doesn't understand what's going on . . . I'm good to go. Don't even worry. I am being as compliant as can be. You can handcuff me, do whatever you need to do right now." Corporal Hazzard asked Defendant why the girlfriend did not understand and inquired whether she spoke English and if she had an education. Defendant explained that the girlfriend had recently been released from the hospital for being suicidal and reiterated that the girlfriend "just didn't understand." In response, Corporal Hazzard stated, "Well she needs to understand that this is police work." Corporal Hazzard secured Defendant in the back of her Tahoe on the passenger side so that she could separate him from the girlfriend.[7]

Then Corporal Hazzard turned her attention back to the girlfriend who remained highly emotional and began crying. Defendant became irate as he saw Corporal Hazzard engaging with the girlfriend. He could hear their conversation from the back of the Tahoe because the stop was being recorded. Defendant began grunting and shouting "Stop talking!" The girlfriend, still

---

[7] Corporal Hazzard testified that, aside from the safety concerns, she felt the need to move Defendant to the Tahoe because the Charcoal Pit parking lot was a "crowded location," and the activity had become distracting to the people who were inside the Charcoal Pit or inside of their vehicles.

5

seated in the vehicle, told Corporal Hazzard that she had grabbed the steering wheel while Defendant was driving in an attempt to kill both herself and Defendant. She then stated that she still wanted to hurt herself. At that point, Corporal Hazzard asked the girlfriend to step outside of the vehicle. The girlfriend complied and stood next to the driver's side with her hands on top of the vehicle.

Trooper Jewel arrived on the scene while Corporal Hazzard was questioning the girlfriend, and Corporal Hazzard briefed him on the situation.[8] While Corporal Hazzard was talking to the girlfriend, the girlfriend stated that she had consumed alcohol and had taken her prescribed anxiety medication. She then began crying and told Corporal Hazzard and Trooper Jewel that she wanted to die. Corporal Hazzard placed her on the sidewalk curb next to The Pit along the driver's side of the vehicle. When Defendant saw and heard this exchange, he began yelling, "Don't touch her!" and started tapping his handcuffs on the window of the Tahoe.

Given the passenger's mental state, Corporal Hazzard determined that the girlfriend needed to be evaluated at a hospital and that Defendant needed to be evaluated for DUI. Thus, she called for assistance from another police unit.

At the same time, Trooper Jewel went to check on Defendant who was handcuffed in the rear of Corporal Hazzard's Tahoe. He opened the Tahoe door and Defendant stated, "Marine Special Forces, you can't cuff me," as he handed the handcuffs to Trooper Jewel. Trooper Jewel asked Defendant to exit the patrol vehicle to reapply the handcuffs. Defendant initially refused to be re-handcuffed but eventually complied and was placed back in the Tahoe. As Trooper Jewel walked away, Corporal Hazzard handcuffed the girlfriend and Defendant then became incredibly animated. He yelled, jerked his body, banged his head against the seat of the Tahoe,

---

[8] Trooper Jewel testified that he did not personally interact with the passenger. When Corporal Hazzard briefed Trooper Jewel, she stated, "I got him out of the car because he's plastered . . . almost killed her coming around the corner . . . then [the girlfriend] comes out and is freaking out."

6

and then banged his head against the window. Trooper Jewel once again walked over to the Tahoe and told Defendant to stop banging on the window. Defendant yelled, "What are you doing to her?" Corporal Hazzard then joined Trooper Jewel and they decided to transport the girlfriend to the hospital. Corporal Hazzard explained to Defendant that the girlfriend had to be handcuffed in order for the Troopers to transport her. At this point, the girlfriend walked over to Corporal Hazzard and Trooper Jewel while they were talking to Defendant, and she began crying and yelling even louder. Eventually, Defendant stopped yelling and the girlfriend walked back to Defendant's vehicle where she freed her hands of the handcuffs. Corporal Hazzard walked over to the girlfriend, reapplied the handcuffs, and helped her walk back to the curb. She stayed at the curb for the remainder of the stop.

Corporal Hazzard and Trooper Jewel determined that they would not be able to continue their investigation while Defendant and the passenger were both on the scene. Thus, Corporal Carroll and Trooper Gliem reported to the Pit in order to provide backup.[9] At the time, Corporal Carroll was acting as a field training officer ("FTO") to Trooper Gliem, who had started working for Troop 1 of the Delaware State Police in August 2013. The Troopers decided that Trooper Gliem would conduct the DUI investigation of Defendant while Corporal Hazzard assisted Defendant's passenger in seeking medical attention at the hospital.

Corporal Carroll was driving a fully marked Crown Victoria. She was parked perpendicular to and in front of Defendant's vehicle. Trooper Jewel transferred Defendant from the Tahoe to Corporal Carroll's vehicle so that Corporal Hazzard could take the passenger to the hospital. Defendant exited the Tahoe without difficulty and, as he walked past Corporal

---

[9] Corporal Carroll and Trooper Gliem arrived on the scene at approximately 10:50 p.m. While Corporal Hazzard was briefing Corporal Carroll and Trooper Gliem, Defendant began banging his head on the window, and stated that he wanted to know why his girlfriend was being transported to the hospital. Corporal Hazzard told him that the girlfriend stated that she wanted to take her life and his life, which is why she grabbed the steering wheel.

7

Hazzard's vehicle, he stopped. After a few seconds Trooper Jewel, who was standing to the right of Defendant, placed his hand on Defendant's right arm in an attempt to compel Defendant to continue walking to Corporal Carroll's vehicle. Defendant began walking again but, after a few steps, dug his heels in and turned away from Trooper Jewel. In response, Trooper Jewel took his hands, placed them on Defendant's throat, and forced Defendant to the ground. When this happened, the girlfriend began screaming and crying uncontrollably. After a few seconds, the Troopers picked Defendant up and placed him in Corporal Carroll's vehicle. Trooper Gliem and Corporal Carroll transported Defendant to Troop 1.[10] After Corporal Carroll and Trooper Gliem left the scene, Corporal Hazzard moved the girlfriend to the Tahoe, drove her to the hospital, and did not have any further interaction with Defendant.

### ii. The Subsequent Arrest at Troop 1

At Troop 1, Trooper Gliem conducted a DUI investigation under the supervision of Corporal Carroll. On cross-examination, Corporal Carroll testified that as Trooper Gliem's FTO she completed a Daily Observation Report ("DOR"), which is an internal police report that evaluates a field trainee officer's performance.[11] The availability of the DOR was disclosed for the first time at trial. As a result, the Court recessed to give Defense Counsel an opportunity to review the DOR to determine whether it contained *Jencks*[12] or *Brady*[13] material. Defendant ultimately objected to Corporal Carroll's testimony and to the DOR, arguing that the DOR contained *Brady* material. In the DOR Corporal Caroll wrote, "[Trooper Gleim] missed a few

---

[10] While in transit, Defendant was respectful to Corporal Carroll and Trooper Gliem, but made comments about how he previously broke free from the handcuffs. Defendant stated, however, that he would not break free from the cuffs again.

[11] Defendant objected to this testimony and argued that the State violated its discovery obligations under *Court of Common Pleas Criminal Rule* 16 ("*Rule* 16") because he was unaware that such a report existed. The Court recessed to allow the State to determine the location of the report and whether the report contained any *Jencks* material. The State was able to locate the document, however, the Court expressed its frustration with the State for failing to follow proper discovery procedures.

[12] *Jencks v. U.S.*, 353 U.S. 657 (1957).

[13] *Brady v. Maryland*, 373 U.S. 83 (1947).

steps while giving directions." The State argued that there was no intentional misconduct on its part and, that Defendant should be given an opportunity to cross-examine Corporal Carroll about the DOR rather than suppress any evidence of Corporal Carroll's testimony. The Court allowed the State to enter the DOR into evidence but reserved its decision on whether the DOR contained *Brady* material.

On cross-examination Trooper Gleim stated that she decided to conduct a DUI investigation based on her own observations—that Defendant exhibited blood shot, glassy, watery eyes, emanated a strong odor of alcohol, and behaved very abnormally—as well as Corporal Hazzard's observations. Trooper Gliem testified that this was the first time that she conducted a DUI investigation outside of the Police Academy, but stated that she performed the tests in accordance with her training.[14]

At Trooper Gliem's request, Defendant performed the alphabet test and counted backwards from sixty-nine to fifty-two. Based on Defendant's performance on these two preliminary tests, Trooper Gliem requested Defendant to submit to three field sobriety tests. First, Trooper Gliem administered the horizontal gaze nystagmus ("HGN") test and found that Defendant exhibited all six of the possible clues.[15] Trooper Gliem then administered the walk-and-turn test. Trooper Gliem testified that she did not recall the exact instructions that she gave to Defendant, but conceded that she probably instructed him differently than she does now. During this test, Trooper Gliem observed that Defendant missed heel to toe on at least half or more of the steps that he took. Finally, Trooper Gliem administered the one-leg stand test and found that Defendant's performance indicated that he was impaired by alcohol.

---

[14] Trooper Gliem is certified to conduct field tests under the authority of the National Highway Traffic and Safety Administration ("NHTSA").
[15] Trooper Gliem indicated that Defendant's eyes did not follow the pen, demonstrating a lack of smooth pursuit, and observed nystagmus at a maximum deviation in both eyes.

After the State rested, Defendant took the stand and testified on his behalf. Defendant served in the United States Marine Corps from June 27, 2006 until August 2013. He served two tours of duty in Iraq.[16] He recounted an IED Incident where an IED detonated and caused dirt, debris and white phosphorous to blow into his eyes. Defendant also testified that he suffers from panic attacks and post-traumatic stress disorder ("PTSD") as a result of serving his two tours. As result of these medical conditions, Defendant had sought medical treatment and was prescribed three different medications to combat his anxiety, depression, PTSD, and inability to sleep. He explained that whenever he is enclosed in small places, he shakes, becomes nauseous, and eventually loses control of his emotions. Defendant further testified that while he was handcuffed and in the back of Corporal Hazzard's vehicle, he suffered from a "pretty bad" panic attack. He explained that he felt like he was going to vomit and began "freaking out." He also testified that he calmed down once Trooper Jewel transported him to Corporal Carroll's car. He explained that his panic attacks are uncontrolled and unexplainable.

After considering all of the testimony and the evidence in the record of the suppression hearing, the Court determined that the State met its burden of establishing probable cause to arrest Defendant for DUI.

## B. Trial

At trial, the State proffered Trooper Gliem as its sole witness, and she provided the following testimony: Following the field sobriety tests, Trooper Gliem administered an Intoxilyzer test.[17] Prior to administering the test, she sat with Defendant and personally observed

---

[16] In an earlier Order, the Court incorrectly stated that Defendant served two tours in Afghanistan. After reviewing the testimony, the Court realized that Defendant actually served two tours in Iraq, and "spent time" in Afghanistan.
[17] During *voir dire*, when Trooper Gliem testified that the Intoxilyzer machine had been calibrated in August 2013 and September 2013, Defendant objected, arguing that the State made another discovery violation because the Intoxilyzer was calibrated in August 2013 and September 2013, and he only received the August calibration card. The State maintained that its failure to disclose the September calibration card was inadvertent. The Court recessed, and gave Defendant an opportunity to review the September calibration card. Thereafter, Defendant continued its

10

him for a twenty-minute period, which began at 11:39 p.m. During this time period, Defendant did not have anything in his mouth. At 12:05 a.m. Trooper Gliem inserted the Intoxilyzer card into the machine, and at 12:06 a.m. she administered the test, which indicated that Defendant had a BAC of .185.[18]

At the conclusion of trial Defendant challenged whether the State met the four-hour requirement under 21 *Del. C.* § 4177(a)(5), and the Court reserved its decision.

## DISCUSSION

The Court will first address Defendant's Motion to Suppress, explain its reasoning for finding that probable cause existed to arrest Defendant, and resolve any remaining issues that arose during the suppression hearing. Next, the Court will analyze whether the State has met its burden in proving beyond a reasonable doubt that Defendant is guilty of DUI in violation of 21 *Del. C.* § 4177.

### A. The Suppression Hearing

On a motion to suppress the State bears the burden of establishing, by a preponderance of the evidence, that the challenged search or seizure did not violate the rights of Defendant guaranteed by the federal Constitution, the Delaware Constitution, and Delaware statutory law.[19] In this action Defendant first challenged the legality of his detention, which he contends took

---

*voir dire* of Trooper Gliem. Upon further questioning, Defendant challenged whether Trooper Gliem had personal knowledge of how the State Chemist calibrates the machines. Ultimately, the Court found that Trooper Gliem's testimony was sufficient to satisfy the requirements under Delaware Rule of Evidence ("DRE") 803(6) because Trooper Gliem testified that she had witnessed the State Chemist calibrate the machines, and knew how the State Chemist performed the calibrations. Thus, the August 2013 and September 2013 calibration cards were admitted as State's Exhibits 5 and 6, respectively, over Defendant's objections.

[18] On the Intoxilyzer card, Trooper Gliem only indicated the time in which she began the observation period, inserted the Intoxilyzer card, and administered the test. She did not actually indicate the time in which she ended the observation period. Defendant objected to the admissibility of the test, arguing that the twenty minute observation period was not properly documented. The Court found that based on Trooper Gliem's testimony—specifically that she sat with Defendant and personally observed him for twenty minutes—the twenty minute observation period was met, and on that basis, overruled Defendant's objection.

[19] *State v. Rickards*, 2 A.3d 147, 148 (Del. Super. 2010), *aff'd*, 30 A.3d 782 (Del. 2011) (citing *Hunter v. State*, 783 A.2d 558 (Del. 2001)).

11

place when Corporal Hazzard took his car keys upon approaching his vehicle. Defendant then asserted that Corporal Hazzard's actions in handcuffing him and placing him in the back of her Tahoe constitutes an arrest for which she had no probable cause. Defendant also argued that the field tests should be suppressed because of an alleged *Brady* violation and, because it is unclear whether Trooper Gliem complied with NTSHA standards in her instructions. Finally, Defendant argued that the Court should not consider his behavior in its probable cause analysis because he suffers from PTSD. The Court will address these issues in turn.

### *i.*      *Corporal Hazzard Properly Detained Defendant During Her Investigatory Stop in Accordance with* **11 Del. C. § 1902**

The Fourth Amendment of the United States Constitution and Article I, Section 6 of the Delaware Constitution afford individuals protection from unreasonable searches and seizures.[20] An individual is considered "seized" when, in view of the circumstances, a reasonable person would not feel free to leave or ignore the police presence.[21] In this action, Corporal Hazzard took Defendant's car keys and placed them on top of his vehicle immediately upon her initial contact with him. Thus, Defendant was seized at that moment.

A police officer may stop and detain an individual if the officer has reasonable suspicion that the individual has committed, is committing, or is about to commit a crime.[22] "'Reasonable suspicion has been defined as the officer's ability to point to specific and articulable facts which, taken together with all rational inferences from those facts, reasonably warrant the intrusion.'"[23] In determining whether an officer had reasonable articulable suspicion, the Court evaluates the evidence "'in the context of the totality of circumstances[,] as viewed from the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts

---

[20] *See Michigan Dept. of State Police v. Sitz,* 496 U.S. 444 (1990).
[21] *State v. Huntley,* 777 A.2d 249, 254 (Del.2000) (citing *Michigan v. Chesternut,* 486 U.S. 567, 573 (1988)).
[22] *Hicks v. State,* 361 A.2d 6, 9 (Del. 1993) (citing *Terry v. Ohio,* 392 U.S. 1, 22 (1968)).
[23] *Coleman v. State,* 562 A.2d 1171, 1174 (Del. 1989) (quoting *Terry,* 392 U.S. at 21).

with an officer's subjective interpretation of those facts.'"[24] An investigatory detention "must be minimally intrusive and reasonably related in scope to the circumstances which first justified the interference."[25] "[T]his rule allows for the constitutional principle that limited intrusions may, on balance, be justified by special law enforcement interests so long as the police have an articulable basis for suspecting criminal activity."[26] Determining the reasonableness of the means used to effectuate an investigatory detention is decided on a case-by-case analysis.[27]

In this action, Corporal Hazzard had reasonable suspicion to believe that Defendant had violated several traffic laws. Corporal Hazzard observed Defendant driving erratically, screeching tires and weaving in and out of traffic. Defendant also failed to respond to Corporal Hazzard's emergency lights, siren, and instruction to pull over. In addition, Corporal Hazzard smelled a strong odor of alcohol upon approaching Defendant. These observations provided Corporal Hazzard with a reasonable articulable suspicion to stop and detain Defendant for investigatory purposes. Under these circumstances, Corporal Hazzard's decision to take Defendant's keys was very reasonable and necessary to be able to safely conduct her investigation.

Defendant argued that because Corporal Hazzard conducted an investigatory stop when she took his keys, she was required and failed to comply with 11 *Del. C.* § 1902(a).[28] According to § 1902, a police officer "may stop any person abroad, or in a public place, who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination." Defendant contends

---

[24] *State v. Vizcarrondofargas*, 2011 WL 6946978, at *3 (Del. Com. Pl. Dec. 14, 2011) (*citing Jones v. State*, 744 A.2d 856 (Del. 1999)).
[25] *Hicks*, 361 A.2d at 11 (citing *Coleman*, 562 A.2d at 1176).
[26] *Id.* at 12 (citing *Michigan v. Summers*, 452 U.S. 692, 699 (1981)).
[27] *State v. Parks*, 95 A.3d 42, 50 (Del. Super. 2014).
[28] *State v. Bowden*, 273 A.2d 481 (1971).

that Corporal Hazzard failed to make inquiries required by § 1902 and argues that, under *State v. Bowden*, the detention is invalid. In *Bowden*, the Delaware Supreme Court found that an officer must strictly adhere to § 1902 prior to making a seizure, and the failure to do so results in the suppression of any evidence obtained as a result of the detention.[29]

The Court finds that Defendant's reliance on *Bowden* is misplaced because Corporal Hazzard complied with the requirements of § 1902. First, her detention was made after witnessing Defendant's erratic driving and failure to respond to emergency signals. Second, she made the inquiries set forth in § 1902 when she obtained Defendant's name, asked his address and his business abroad. Indeed, upon taking Defendant's keys, Corporal Hazzard immediately asked Defendant for his license, registration, proof of insurance, and inquired into Defendant's business abroad and his destination. Defendant stated he was coming from La Tolteca and that he was returning to his apartment in Rodney Square. This strictly complies with the requirements of § 1902. However, even if it did not, in *Buckingham v. State*, the Delaware Supreme Court found that substantial compliance, rather than strict compliance, is sufficient to effectuate a detention under § 1902.[30] Thus, Defendant's initial detention was proper.

### ii. Corporal Hazzard Did Not Effectuate An Arrest When She Handcuffed Defendant and Placed Him In The Back Of Her Tahoe

Defendant argued that he was placed under arrest when he was handcuffed and placed in the back of the Tahoe. The import of this argument is that, at that time, Corporal Hazzard had not developed sufficient probable cause to arrest Defendant for DUI. A seizure may constitute either an investigatory detention, which requires a basis of reasonable articulable suspicion, or a

---

[29] *Id*. at 483–84.
[30] The Delaware Supreme Court noted "that the statutory language of § 1902(a) specifies that the officer 'may' demand of a person answers to the enumerated inquiries. The mandatory term 'shall' is not used." *Buckingham v. State*, 482 A.2d 327, 333 (Del. 1984).

14

custodial arrest, which requires a basis of probable cause.[31] In determining whether a seizure is an investigatory detention or a custodial arrest, the Court examines "the nature and the degree of the intrusion occasioned by the particular encounter" under the totality of the circumstances.[32] In its analysis, the Court considers the following:

> (1) the amount of force used by the police; (2) the need for such force; (3) the extent to which the individual's freedom of movement was restrained; (4) the physical treatment of the individual, including whether handcuffs were used; (5) the number of agents involved; (6) the duration of the stop; and (7) whether the target of the stop was suspected of being armed.[33]

The Court finds that Corporal Hazzard's action of removing Defendant from his vehicle, applying handcuffs to him, and placing him in the Tahoe was reasonable in order to mitigate the peril that had ensued when the girlfriend exited Defendant's vehicle and became highly emotional and belligerent. "The use of handcuffs is a relevant, but not dispositive, factor in distinguishing investigatory detentions from formal arrests."[34] In determining whether the use of handcuffs converts a detention to an arrest, the Court considers "the nature and degree of the intrusion under all of the facts of the particular encounter."[35] It is evident that Corporal Hazzard would not have been able to safely conduct her investigation unless Defendant and the girlfriend were separated. Corporal Hazzard attempted to separate them by having Defendant step out of the vehicle. Unexpectedly, the girlfriend also got out of the vehicle and began yelling. Because of the girlfriend's unstable condition and the yelling commotion between Defendant and the girlfriend, Corporal Hazzard handcuffed Defendant and placed him in the back of her Tahoe in order to effectively separate him from his girlfriend. Failure to do so could have easily compromised Corporal Hazzard's safety. Thus, under the circumstances, the detention of

---

[31] State v. Kang, 2001 WL 1729126, at *6 (Del. Super. 2001).

[32] *Id.* at *6.

[33] *Id.*

[34] *State v. Brinkley*, 2013 WL 1225869, at * 7 (Del. Super. Feb. 19, 2013) (citing *Kang*, 2001 WL 1729126, at *6)).

[35] *Stevenson v. Delaware*, 1999 WL 464524, at *3 (Del. Super. Apr. 27, 1999) (citing *State v. Biddle*, Cr. A. No. 956–06–006939, Barron, J. (Sel. Super. Aug. 9, 1996)).

Defendant was minimally intrusive and necessary for purposes of carrying on the investigation and for Corporal Hazzard's safety.[36]

Moreover, while Defendant was in the back of the Tahoe, he became more belligerent—banging his head on the window multiple times, yelling, and freeing his hands of the handcuffs. Meanwhile, the girlfriend continued to act disorderly by screaming, laying on the ground, and stating that she wanted to take her life. This unfolding situation made it necessary for the Troopers to transport Defendant to Troop 2 to safely continue the DUI investigation. "'[P]olice officers may transport suspects from a scene as part of an 'investigatory detention' when such action is *reasonable and necessary* under the circumstances.'"[37] It was clear to the Troopers that the situation would not be mitigated, and their investigation could not ensue, if both Defendant and the girlfriend remained on the scene.

Thus, placing Defendant in the back of Corporal Hazzard's Tahoe constituted an investigatory detention and not an arrest. In addition, the decision to transport Defendant back to Troop 2 so that he could submit to field sobriety tests was permissible considering the circumstances that took place at the stop.

### iii. The State's Failure to Disclose the DOR Does Not Constitute a Brady Violation

Defendant objected to Corporal Carroll's testimony and to the DOR, arguing that the DOR contained *Brady* material because in it, Corporal Carroll wrote "[Trooper Gleim] missed a few steps while giving directions." Under *Brady*, the United States Supreme Court held "that the prosecution's failure to disclose evidence favorable to an accused upon request violates due

---

[36] Additionally, because of the nature of the stop, briefly detaining Defendant in order to wait for additional police units to arrive is also reasonable. *See Loper v. State*, 8 A.3d 1169, 1173 (Del. 2010).

[37] *State v. Davis*, 2012 WL 3794286, at *2 (Del. Com. July 9, 2012) (quoting *Kang*, 2001 WL 1729126, at *6)("For example, in *State v. Burris,* [this Court] found that it was reasonable and necessary to transport a defendant from the scene of a motor vehicle accident as part of an investigatory detention to conduct field tests because there was no shoulder on the roadway near the scene, it was raining, and only the investigating officer was present.").

16

process when the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution."[38] The State has a duty to disclose exculpatory evidence irrespective of the defendant's actions,[39] and need "'only [ ] disclose evidence that, if suppressed, would deprive the defendant of a fair trial.'"[40]

In order to establish a *Brady* violation, a defendant must demonstrate that "[t]he evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching; that [the] evidence [was] suppressed by the State, either willfully or inadvertently; and prejudice [ ] ensued."[41] Exculpatory evidence is considered to be material if it "creates 'a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"[42] This occurs when "the government's evidentiary suppression "'undermines confidence in the outcome of the trial.'"[43] Moreover, "[m]ateriality is not limited to the individual effect of each piece of exculpatory or impeachment evidence. Instead, materiality is determined 'in the context of the entire record,'"[44] and the *cumulative effect* of the evidence suppressed by the State.[45]

In this action, the State's failure to disclose the DOR does not constitute a *Brady* violation. The DOR, specifically Corporal Carroll's note that "[Trooper Gleim] missed a few steps while giving directions" was not material in the context of the entire record. The record is void of any indication that the State's failure to disclose the DOR resulted in any prejudice to Defendant. Even without the DOR, Defense Counsel still was able to effectively cross examine

---

[38] *Michael v. State*, 529 A.2d 752, 755 (Del.1987) (citing *Brady*, 373 U.S. 83).
[39] *Gray v. United States*, 2015 WL 4776945, at *7 (D. Del. Aug. 13, 2015) (citing *United States v, Agurs*, 247 U.S. 97, 107 (1976); *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).
[40] *State v. Powell*, 2016 WL 3023740, at *32 (Del. Super. May 24, 2016) (quoting *Michael*, 529 A.2d at 755).
[41] *Goode v. State*, 136 A.3d 303, 312–13 (Del. 2016) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).
[42] *Wright v. State*, 91 A.3d 972, 988 (Del. 2014) (quoting *Starling v. State*, 882 A.2d 747, 756 (Del. 2005) (emphasis added) (quoting *Jackson v. State*, 770 A.2d 506, 516 (Del. 2001)).
[43] *Id.* (citing *Kyles*, 514 U.S. at 434).
[44] *Id.*(citing *United States v. Agurs*, 427 U.S. 97, 112 (1976)).
[45] *Id.* (citing *Kyles*, 514 U.S. at 421) (emphasis supplied).

Corporal Carroll and Trooper Gliem, and highlight Trooper Gliem's inexperience at the time of the stop and arrest.[46] Thus, the State's failure to disclose the DOR did not create a reasonable probability that, had the DOR been disclosed, the result of the suppression hearing (and ultimately, the trial) would have been different.

### iv. Defendant's Arrest Was Supported by Probable Cause

Under the Fourth Amendment, an arrest must be supported by probable cause. "Probable cause exists where the facts and circumstances within the police officer's knowledge, and of which the police officer had reasonably trustworthy information, are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been or is being committed."[47] In order for the Court to find that probable cause existed the State must show that, under the totality of the circumstances, the arresting police officer believed that there was a fair probability that criminal activity was occurring or has occurred.[48] Probable cause to arrest for DUI "rests upon the observations of the arresting officer, which includes the driver's performance on field sobriety tests."[49]

Although there were four different officers involved in either the traffic stop or subsequent arrest of Defendant, Corporal Hazzard and Trooper Gliem were the State's witnesses who provided testimony about whether defendant was driving under the influence of alcohol.[50] Corporal Hazzard described Defendant to look dazed and not alert, and indicated that she

---

[46] Trooper Gliem testified that prior to administering the tests, she and Corporal Carroll reviewed the way in which the tests should be conducted. Corporal Carroll testified that she was present while Trooper Gliem administered the field sobriety tests and that Trooper Gliem followed protocol in conducting the DUI investigation.

[47] *Bease v. State*, 884 A.2d 495, 498 (Del.2005).

[48] *Miller v. State*, 4 A.3d 371, 373 (Del.2010).

[49] *State v. Mulholland*, 2013 WL 3131642, at *4 (Del. Com. Pl. June 14, 2013).

[50] When Trooper Jewel testified, he could not recall whether Defendant's eyes exhibited any signs of alcohol impairment or if he had smelled an odor of alcohol on Defendant's breath. Trooper Jewel only recalled that Defendant was acting in a disorderly manner. In a similar vein, Corporal Carroll did not testify as to any specific observations she made as to whether Defendant exhibited signs of alcohol impairment. Instead, Corporal Carroll testified as to her observation of Trooper Gliem as Trooper Gliem conducted the DUI investigation.

18

smelled a strong odor of alcohol upon approaching Defendant's vehicle. Similarly, Trooper Gliem testified that she detected a strong odor of alcohol emanating from Defendant's breath, and observed Defendant to have blood-shot, watery, and glassy eyes. Moreover, Defendant admitted to consuming alcoholic beverages at a nearby restaurant, prior to driving. All of the Troopers described Defendant as acting disorderly. Moreover, the MVR shows Defendant screaming, not following instructions, banging his head against the back of the Tahoe, freeing himself of the handcuffs, and otherwise acting belligerent.[51]

At Troop 1, Trooper Gliem administered two preliminary tests and three field sobriety tests. First, Defendant performed the alphabet test. Trooper Gliem testified that she instructed Defendant to recite the letters of the alphabet from F to P, and that Defendant basically sang the alphabet from the beginning, failed to complete the test as he was directed, and spoke to Trooper Gliem in an inappropriate manner. Then, Defendant was instructed to count backwards from sixty-nine to fifty-two. While performing the counting test, Defendant transported the numbers.

Based on Defendant's performance on these preliminary tests, Trooper Gliem requested Defendant to submit to three field sobriety tests. First, Trooper Gleim administered the HGN test. Trooper Gliem testified that prior to administering the test, she asked Defendant if he was injured or had any "eye issues." Defendant responded that while he did not have any current eye issues, his eyes had been exposed to white phosphorous during the detonation of an improvised explosive device ("IED") while he was serving overseas (the "IED Incident"). Nonetheless, Trooper Gliem testified that she was satisfied that he was capable of performing the HGN test

---

[51] Defendant requests that the Court not consider Defendant's disorderly conduct during the stop and detention in its probable cause analysis, arguing that the conduct was a product of Defendant's PTSD. While the Court does not doubt or discredit the fact that Defendant may suffer from PTSD as a result of serving the country during his two tours of duty, his condition is irrelevant as it applies within the probable cause analysis. As explained above, probable cause is based off of the facts and circumstances within the police officer's knowledge. At no point during the stop or detention did Defendant state that he suffered from panic attacks or PTSD. Thus, at the time of the stop and detention, the Troopers had no reason to believe that Defendant suffered from PTSD or panic attacks, and therefore, Defendant's behavior will be considered in the Court's probable cause analysis.

based on his response that he had no "eye issues."[52]  Trooper Gliem testified that Defendant exhibited all six of the possible clues on the HGN test, which she considered to be a failure.[53]

Trooper Gliem then administered the walk-and-turn test.  Trooper Gliem stated that she did not recall the exact instructions that she gave to Defendant, but conceded that she probably instructed him differently than is her current practice.  Because Trooper Gliem could not provide any testimony about how she instructed Defendant, the Court did not consider the walk-and-turn test results in its probable cause analysis.

Finally, Trooper Gliem administered the one-leg stand test.  Prior to the test, Defendant stated that he had "balance issues" as a result of the IED Incident.  Trooper Gliem testified that she found that Defendant was capable of performing the test.  During the one-leg stand test, Defendant raised his right foot and bent his left knee slightly.  Defendant also interlocked his fingers as he held his hands out in front of him, then placed his hands behind his back, but at all times, Defendant's arms were raised at least six inches from him side.  During the first ten seconds, Defendant swayed and raised his arms.  During the next ten seconds, eleven to twenty, Defendant swayed, raised his arms, and hopped. Because of Defendant's stated issues with balance caused by the IED Incident, the Court did not consider the one-leg stand test in its probable cause analysis.

In determining that probable cause existed for Trooper Gliem to arrest Defendant, the Court considered the following factors: (1) Defendant's erratic driving; (2) the traffic violations (including failure to respond to police signals and instructions); (3) an admission to drinking alcohol prior to driving; (4) the plain view of alcohol in the vehicle; (5) dazed, glassy, and

---

[52] Defendant told Trooper Gliem that he had white phosphorous in his eyes, but indicated that it would not hinder him from performing the HGN.

[53] Trooper Gliem indicated that Defendant's eyes did not follow the pen, demonstrating a lack of smooth pursuit, and observed nystagmus at a maximum deviation in both eyes.

20

watery eyes; (6) strong odor of alcohol; (7) disorderly and belligerent conduct; and, (8) Defendant's performance on the HGN test. Accordingly, when each of these factors were considered in total, the Court found that Trooper Gliem had probable cause to arrest Defendant for DUI.[54]

## B. The DUI Offense

Under 21 *Del. C.* § 4177(a)(1), "[n]o person shall drive a vehicle . . . when the person is under the influence of alcohol." In order for a defendant to be found guilty under § 4177, the State must prove beyond a reasonable doubt that: (1) the defendant drove a motor vehicle at or about the time and place charged, and; (2) the defendant was under the influence of alcohol while he was driving.[55]

In this action, there is no dispute that Defendant was driving the vehicle. Corporal Hazzard followed Defendant for approximately one mile as he drove southbound on Concord Pike. Defendant, however, challenges whether the State has met its burden of establishing that he was under the influence while driving. Pursuant to 21 *Del. C.* § 4177(a)(5), no person shall drive a vehicle "[w]hen the person's alcohol concentration is, within 4 hours after the time of driving[,] .08 or more."

In this case, the Intoxilyzer test indicated that Defendant's BAC level was .185, which is clearly over the legal limit of .08. Defendant, however, contests, whether the State met its burden of establishing compliance with the four-hour rule requirement. Corporal Hazzard testified that she stopped Defendant at approximately 10:20–10:30 p.m. on September 14, 2013.

---

[54] *Rybicki v. State*, 119 A.3d 663, 671 (Del. 2015), *reargument denied* (Aug. 5, 2015) ("'[A] traffic violation combined with an odor of alcohol, standing alone, do[es] not constitute probable cause to arrest [a] driver for a DUI offense.' *Lefebvre v. State,* 19 A.3d 287, 292–93 (Del. 2011). Yet, when 'rapid speech, admission to drinking, bloodshot and glassy eyes and a failed alphabet test' are added to a traffic violation and odor of alcohol, the probable cause standard has been satisfied. *Id.*).
[55] *Lewis v. State*, 626 A.2d 1350, 1355 (Del. 1993).

Trooper Gliem testified that she specifically remembered the time when Corporal Hazzard stopped Defendant—which she stated was 10:24 p.m.—because the time reflected her birthday. Additionally, the Intoxilyer card indicated that the time in which Trooper Gliem conducted the Intoxilyzer test was 12:06 a.m. on September 15, 2013, which was less than two hours after the initial stop. Thus, the record establishes that Trooper Gliem conducted the Intoxilyer test within four-hours of Defendant's arrest, as required under 21 *Del. C.* § 4177(a)(5). Based on the foregoing, the Court finds that the State has met its burden of proving beyond a reasonable doubt that Defendant is guilty of DUI as alleged in the Information.

## CONCLUSION

For the foregoing reasons, the Court finds Defendant **GUILTY** of Driving Under the Influence of Alcohol, in violation of 21 *Del. C.* § 4177. This Judicial Officer shall retain jurisdiction of this case and will schedule it forthwith for sentencing.

**IT IS SO ORDERED this 22nd day of August, 2016.**

_____
Sheldon K. Rennie,
Judge

22