IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| STATE OF DELAWARE, | ) |
| | ) |
| v. | ) I.D. No. 2212001161 |
| | ) |
| TEDDY WILSON, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Submitted: November 4, 2024
Decided: November 8, 2024

Defendant's Motion to Suppress – **Denied.**
Defendant's Motion in *Limine* – **Denied.**

Thomas J. Williams, Esquire, Department of Justice, *attorney for the State*.

Alicea A. Brown, Esquire, Office of Defense Services, *attorney for Teddy Wilson*.

**Miller, J.**

# I.     *Introduction*

After being involved in a traffic accident, defendant Teddy Wilson ("Wilson") was detained for suspicion of driving under the influence of alcohol. He was transported to the police station where Corporal Fiore ("Fiore"), of the Delaware State Police, administered a Horizontal Gaze Nystagmus test, which resulted in six clues that Wilson was under the influence. After a period of observation, Fiore administered an Intoxilyzer test, which revealed Wilson's blood alcohol content was .124%. He was arrested for driving under the influence.

Wilson filed a Motion to Suppress, seeking to exclude the results of the test because there was no probable cause to administer it. Wilson challenges Fiore's observations of Wilson and asserts that Fiore failed to properly administer field tests.

If probable cause is found, Wilson challenges the State's evidentiary foundation for the admission of the Intoxilyzer test results because Fiore failed to follow the strict 20-minute observation period.

Due to the failure to follow the standardized procedures for the Horizontal Gaze Nystagmus test, the Court gives no weight to the test results. Even without that test, however, probable cause existed to administer the Intoxilyzer test.

Further, the evidence shows that Fiore satisfied the 20-minute observation period before beginning the Intoxilyzer test. Therefore, the Motion to Suppress and the Motion in *Limine* are **DENIED**.

## II. *Factual Background*[1]

### A. *Fiore observes Wilson at the scene.*

On December 3, 2022, Fiore was dispatched to Governor Printz Boulevard in response to a reported two-car collision. Fiore determined that a Chevrolet Malibu and a Mazda, operated by Wilson, had been in a collision. The driver of the Malibu reported that she was traveling in the right lane of southbound Governor Printz Boulevard when the Mazda hit her car on the right side. The Malibu came to a rest in a ditch off the northbound lanes of the boulevard. Fiore observed physical damage to the Malibu consistent with the driver's version of events.

Fiore's interaction with Wilson was captured on his Body Worn Camera ("BWC"),[2] which was played at the suppression hearing. Wilson said he was exiting his driveway onto Governor Printz Boulevard when he pulled out and the collision occurred. Wilson denied hitting the Malibu. He initially denied consuming alcohol, but later admitted to drinking a beer, five to six hours before the accident.

When he approached Wilson, Fiore "immediately detected the distinct odor of an alcohol beverage emanating from his breadth while he spoke." Wilson's "eyes were blood-shot, watery, and glassy." Fiore noted that Wilson "was slurring and

---

[1] The facts are derived from the evidence and testimony at the suppression hearing.
[2] The BWC videos from Fiore and Corporal Marley, who was first on the scene, were admitted into evidence.

3

mumbling" his speech "to the point it was almost not understandable." Based on these observations, Fiore believed Wilson was impaired.

Fiore asked Wilson if he "would do any kind of testing to see how intoxicated" he was.[3] Wilson refused to perform any field tests, stating he was not intoxicated, and he was not going to "do[] all of that." Fiore then detained Wilson and transported him to Troop 1.

During Fiore's interaction with Wilson at the scene, Wilson was cooperative and had no difficulty walking or maintaining his balance.

**B.** ***Fiore conducts tests at the station.***

**1.** ***The HGN test***

Fiore testified that he is trained in administering Standardized Field Sobriety Tests ("SFSTs"). He completed his police academy training in 2011, which included 40 hours of classroom training on the basics of National Highway Transportation Safety Administration ("NHTSA") guidelines. Additionally, he received a certification in Advance Roadside Impaired Driving Enforcement, a federal program sponsored by NHTSA, in 2015. Fiore is trained to administer three SFSTs: the Horizontal Gaze Nystagmus[4] ("HGN"), Walk and Turn, and One Leg Stand. Fiore has conducted hundreds of DUI investigations.

---

[3] D.I. 14, ¶ 2.

[4] Nystagmus "is an involuntary jerking of the eye that becomes noticeable to the naked eye." Being impaired by drugs or alcohol is one cause for nystagmus.

### i.       *The Guide's[5] procedures for administering the HGN test.*

The HGN test is a standardized procedure that helps law enforcement evaluate whether a person is under the influence of alcohol.  The test has three components, or "clues": (1) Lack of Smooth Pursuit; (2) Sustained Nystagmus at Maximum Deviation; and (3) Onset of Nystagmus Prior to 45 Degrees.

Under the NHTSA standards, officers are required to conduct a "pre-test," which evaluates pupil size, resting nystagmus, and equal tracking.[6]  If abnormal findings are observed during the pre-test checks, the officer "may choose not to continue with the testing [and] if HGN testing is continued, officers are reminded this does not follow the standardized protocol and should acknowledge such in any report."[7]  The Guide also states that "[t]here should be a clear, distinguishable break between the check for Equal Tracking and Lack of Smooth Pursuit," the first component of the test.[8]

Once the pre-check is complete, the officer preforms the test to check each eye for each of the three clues, for a total of six possible clues: each eye must be checked for each clue twice.  The Guide states that observation of four or more clues

---

[5] Wilson Ex. 1: DWI Detection and Standardized Field Sobriety Testing Instructor Guide, published by NHTSA (the "Guide"), at p. 29.
[6] *Id.*
[7] *Id.*
[8] *Id.*

indicates a likelihood that the subject's blood alcohol content ("BAC") is at or above 0.08 and if the procedures are followed, the test is 88% accurate.

### ii. *Fiore administers the HGN test.*

Upon arrival at Troop 1, Wilson agreed to perform SFSTs. Fiore administered the HGN test in a well-lit hallway. Fiore recounted how he conducted the HGN test, which he testified he administered according to NHSTA standards. He instructed Wilson on how to perform the test correctly[9] and asked about glasses/contacts and head injuries.[10] Wilson complied with the instructions. Fiore looked for six clues (three for each eye): Lack of Smooth Pursuit, Horizontal Gaze Nystagmus at Maximum Deviation, and Onset Nystagmus Prior to 45 Degrees, testifying "if [the clue is] there, it's there. If it's not, it's not." Four or more clues indicated impairment. Fiore observed six clues and ruled out false positives, which confirmed his suspicion that the Wilson was impaired. With the result of this test and what Fiore observed of Wilson, Fiore believed he had probable cause to administer the Intoxilyzer test.

---

[9] Fiore instructed Wilson to stand with his feet together with his hands at his side, and informed him that Fiore would be using a pen as the stimulus to track his eyes, and not to move his head while he was doing so.

[10] These questions are required by the NHTSA standards as they could impact the results of the test. Wilson denied any head injuries and stated he was not wearing contacts. He was not wearing glasses at the time of the test.

Fiore administered the Vertical Gaze Nystagmus ("VGN") but did not observe any clues. Fiore did not administer any other SFSTs, the "ABC Test," or the "Counting Test."[11]

On cross-examination, Fiore was unable to recall whether four or more clues indicated an 88% testing accuracy. He testified that he held the stimulus (a pen) about 12-15 inches away from Wilson at eye level and moved it back and forth, starting at center and moving to the far right, back to center, then to the far left and back to center again.[12] In the first two passes, Fiore was checking for both Equal Tracking and Lack of Smooth Pursuit. He testified that this is "the way I've done it." Upon review of the Guide, Fiore admitted that one pass is required for Equal Tracking, followed by two passes for the Lack of Smooth Pursuit clue. Each eye must be checked twice for each clue, so a total of six full passes are required. With the separate Equal Tracking pass, a total of seven passes are required. Fiore admitted that he completed only six passes.

### 2.    *Fiore administers the Intoxilyzer test.*

After the HGN and VGN tests were completed, Fiore asked Wilson if he was suffering from any injuries to his legs that would prevent him from walking a straight

---

[11] Fiore did not administer the finger-to-nose test. He was not trained on that test.

[12] This is one pass as Fiore testified. Defense counsel counted a movement from center to the far right and back to center as one pass and the movement to the left and back to center was a second pass. While Fiore and counsel counted in a different manner, in practical terms, the count was the same.

line. Wilson responded that his left knee was "bothering" him. Fiore told Wilson that, for his safety, no further tests would be administered, including the Walk and Turn test. Fiore then asked Wilson if he would blow into the machine (which was in the room next to where they were standing). Wilson said he would but, he wanted Fiore to administer the walk test, asserting he was not intoxicated. Wilson continued to request the walk test, and Fiore explained that it could not be administered due to the leg injury.[13]

Wilson walked into the room where the Intoxilyzer machine was located and sat in a chair. Fiore sat with Wilson. After an observation period, Fiore administered the Intoxilyzer test, which recorded a BAC of .124%. Wilson was arrested.

On cross-examination, Fiore testified that a subject must be observed for 20 minutes before an Intoxilyzer test can be administered. He usually waits 24 minutes to be sure he has satisfied the wait period. He thought he observed Wilson "four minutes after the 20 minute-ish" period." But he was "not entirely sure. [He] thought it was 24."

Fiore was asked when the observation period began. He first testified that the observation period started when Wilson was walking into the Intoxilyzer room. When asked if the period started when Wilson sat in the chair, Fiore testified "He

---

[13] Fiore testified that NHSTA cautions against doing such tests when there is an injury to avoid false positive results.

doesn't have to sit down. I could watch him while doing the tests … I mean, once the tests were stopped, he couldn't do the tests anymore, I can continue to watch him at that point." When asked if the observation period started when he was in the hall talking with Wilson after the HGN test was completed, Fiore responded: "I assume it would."

Fiore's report reflected that the Intoxilyzer test ended at 22:54 (the time stamp on his BWC). Fiore then subtracted 24 minutes to determine that the observation period began at 22:30. Under further questioning on cross-examination, Fiore testified that he "began the observation period" when he told Wilson that he (Fiore) was not administering the Walk and Turn test, which was at 22:30.

Wilson entered the Intoxilyzer room at 22:31, with Fiore following behind. Fiore turned on the Intoxilyzer machine, took a seat next to Wilson, wrote notes, used the computer for about a minute, and conversed with Wilson from time to time. At 22:51 Fiore inserted the Intoxilyzer card into the machine.

### III.    *Motion to Suppress*

#### A.    *The parties' contentions*

Wilson filed a Motion to Suppress the Intoxilyzer test for lack of probable cause because Fiore failed to administer SFSTs in strict compliance with NHTSA guidelines.[14] First, Fiore administered only the HGN test and did not administer the

---

[14] D.I. 15.

Walk and Turn test or the One Leg Stand test, despite Wilson's willingness to undergo such SFSTs. Second, Fiore failed to follow the NHTSA guidelines when he conducted the HGN test.[15] Without any properly administered SFSTs, and no other factors (demeanor, speech, ability to walk) indicating that Wilson was intoxicated, he argues Fiore did not have probable cause to administer the Intoxilyzer.

The State responds that probable cause existed based on the strong odor of alcohol, Wilson admitting he had consumed a beer, his glassy/watery/bloodshot eyes, his mumbled and slurred speech, his having committed a traffic violation, and the results of the HGN test. The State further argues that even if the HGN test was not administered in strict compliance with the NHTSA guidelines, the results are not to be excluded. Rather, any deviations from the guidelines go to the weight the evidence is given by the Court.

**B.     *Standard of review***

An Intoxilyzer test is a search, and therefore, it is subject to Fourth Amendment protections.[16] Accordingly, an officer cannot administer an Intoxilyzer test without "probable cause to believe that the person was driving while under the

---

[15] D.I. 21.
[16] *State v. Speicher*, 2022 WL 2339865, at *2 (Del. Super. June 29, 2022), citing *Schmerber v. California*, 384 U.S. 757, 767 (1996) and *Bease v. State*, 884 A.2d 495, 498 n.4 (Del. 2005).

influence of alcohol...”[17] “Probable cause exists where the facts and circumstances within the police officer's knowledge, and of which the police officer had reasonably trustworthy information, are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been or is being committed.”[18] “The finding of probable cause does not require proof beyond a reasonable doubt, or even that the defendant's guilt is more likely than not.”[19] Rather, it is measured by the totality of the circumstances;[20] it is a “common-sense determination.”[21] The State bears the burden to prove the existence of probable cause.[22]

In a DUI case, “‘the arresting officer must articulate facts considered in the totality of the circumstances that suggest there is a fair probability that the driver is under the influence.’”[23] Probable cause may be based on a number of factors, such as: “commission of a traffic offense, odor of alcohol, ... rapid speech, ... admission to drinking alcohol, dazed appearance[,]”[24] “commit[ing] multiple traffic violations…; …detect[ing] a *strong* odor of alcohol emanating from Defendant…; … glassy, watery, and dazed [eyes]…; … [a] confused [demeanor]…; … evasive answers…; trouble standing…; admitt[ing] to drinking…; [a] flushed face, …

---

[17] *Id.*, at 498.
[18] *Id.*
[19] *State v. Dale*, 2016 WL 691445, at *2 (Del. Super. Feb, 11, 2026).
[20] *State v. Maxwell*, 624 A.2d 926, 928 (Del. 1993).
[21] *Speicher*, 2022 WL 2339865, at *2, quoting *Edwards v. State*, 320 A.2d 701, 703 (Del. 1974).
[22] *State v. Kang*, 2001 WL 1729126, at *3 (Del. Super. Nov. 30, 2001).
[23] *Speicher*, 2022 WL 2339865, at *2, quoting *Rybicki v. State*, 119 A.3d 663, 670 (Del. 2015).
[24] *Miller v. State*, 4 A.3d 371, 375 (Del. 2010).

slurred speech, and stagger[ing]."[25] Although any one of these factors "considered in isolation, may be insufficient to establish probable cause[,]"[26] combined, they may establish probable cause in the totality of the circumstances. A traffic violation and an odor of alcohol alone, however, are insufficient to establish probable cause.[27]

"Whether probable cause exists to arrest a driver for a DUI offense is generally decided by the arresting officer's observations, which frequently include the quality of the driver's performance on field sobriety tests."[28] NHTSA developed standardized methods for conducting field tests. While strict compliance with the standard procedures is required, failure to strictly comply with the standards does not necessarily invalidate the test results. Rather, "'[t]he Court's role is to take note of the deficiencies in the administration of the sobriety test when giving weight and value to the tests performed.'"[29] Significant deviations from the standard procedures, however, may result in the test being disregarded.[30]

---

[25] *State v. Oseguera-Avila*, 197 A.3d 1050, 1058-59 (Del. Super. 2018) (emphasis in original).
[26]*Speicher*, 2022 WL 2339865, at *3, quoting *Maxwell*, 624 A.2d at, 931.
[27] *Lefebvre v. State*, 19 A.3d 287, 293 (Del. 2011) ("[A] traffic violation combined with an odor of alcohol, standing alone, do not constitute probable cause to arrest the driver for a DUI offense.")
[28] *Id.*, 19 A.3d at 293.
[29] *State v. Dale*, 2016 WL 691445, at *3 (Del. Super. Feb, 11, 2016) (citation omitted).
[30] *Id.*, at *2 (the court disregarded HGN test where it was conducted in 60% of the time required and in poor lighting); *Oseguera-Avila*, 197 A.3d at 1056 (suppressing VGN test because it was not administered for the minimum required four seconds).

## C.    *Discussion*

When conducting the HGN test, the NHTSA standards require a pre-test, during which the officer evaluates pupil size to see if they are the same, looks for resting nystagmus, and determines whether the eyes are tracking the stimulus, *i.e.*, Equal Tracking.[31]  The pre-test is sufficiently important that if abnormal findings are observed and the test is continued, the officer is reminded in the Guide that this *does not follow standardized protocol*, which should be acknowledged in the officer's report.[32]  Also, there is to be a clear, distinguishable break between the Equal Tracking pre-test and the start of the test to look for clues.[33]

In response to Fiore's admission that he did not follow the standardized procedure for the HGN test, the State argues that the Court should just disregard the Lack of Smooth Pursuit clue, which leaves four clues; sufficient for an indication that Wilson's BAC was likely over the legal limit.  This, however, ignores the importance of the pre-test, as established by the Guide.  Indeed, if any abnormality in the pre-test is found, the remainder of the test is not in compliance with the standardized procedures.  Thus, skipping over this validation impacts the results of the remainder of the test that looks for clues.

---

[31] Guide, at p. 29.
[32] *Id.* (emphasis added).
[33] *Id*.

Combining or "doubling up" on the pre-test and the Lack of Smooth Pursuit test, as the State argues, is a significant deviation from the standardized procedures. Due to the failure to follow the pre-test procedures and a lack of clear, distinguishable break between the pre-test and first test, the Court gives no weight to the HGN test results.

The State argues that probable cause exists even without the HGN test. It argues that Fiore's observations of Wilson, including the odor of alcohol, the admission to consuming alcohol, Wilson's slurred speech, and his traffic violation are sufficient probable cause to administer the Intoxilyzer test. The State relies on *Bease v. State,*[34] where the court found probable cause based on the officer's observations and rational inferences drawn therefrom, that the defendant "spoke in a rapid manner…, smelled of alcohol, admitted [to] consum[ing] alcoholic beverages the night before, had bloodshot and glassy eyes, and had just committed a traffic violation by making an improper lane change in an abrupt manner."[35]

Wilson responds that he was cooperative and had no issue with his balance. He disputes that he spoke with slurred speech. Wilson asks the Court to compare his speech in the BWC with his speech in the courtroom during a colloquy before the suppression hearing started. He suggests to the Court that his speech was the

---

[34] 884 A.2d 495 (Del. 2005).
[35] *Id.,* at 499-500.

14

same, thus, his typical speech pattern is not an indication of intoxication. Further, without any properly performed SFSTs, the State did not have probable cause.

Consistent with *Bease,*[36] the Court finds that probable cause existed to administer the Intoxilyzer test. Fiore testified credibly about his observation of Wilson. Fiore noted a "distinct odor" of alcohol coming from Wilson as Fiore approached Wilson. Wilson's eyes were bloodshot, watery, and glassy. Fiore described Wilson's speech as being slurred. Even if the Court were to find that Wilson's speech typically sounds a bit slurred, as the defense suggests, that does not negate the officer's assessment of his observations of Wilson, under the totality of the circumstances.[37] Finally, Wilson committed a traffic violation by failing to yield to the Malibu before he entered the roadway. Accordingly, the Motion to Suppress is **DENIED**.

## IV. *Motion in Limine*

During the suppression hearing, Wilson made an oral motion in *limine* to exclude the results of the Intoxilyzer test for failure to provide a proper foundation for the admissibility of the test results due to a failure to conduct a 20-minute observation period. The Court allowed the parties to develop evidence relating to

---

[36] *See also Higgins v. Shahan*, 1995 WL 108699 (Del. Super. Jan. 18, 1995); *Silverman v. Shahan*, 2002 WL 31999363, at *2 (Del. Com. Pl. Jan. 2, 2002).
[37] Negative or mixed field test results do not negate probable cause based on other factors. *Lefebvre*, 19 A.2d at 295. So Wilson's argument that Fiore should have performed more tests, as Wilson was requesting, does not impact the conclusion that probable cause existed.

15

the observation period. After the hearing, the Court directed the parties to file written submissions addressing the motion in *limine*.[38]

The State objected to the Court considering the motion in *limine* because the hearing was to determine whether probable cause existed and therefore, the observation period was irrelevant. The State identified no prejudice by the Court considering the motion prior to trial.

The Supreme Court made clear in *Clawson v. State* that an objection concerning the 20-minute observation period is an evidentiary issue that may be raised "either by pretrial motion or by an objection at trial." [39] Because the parties were provided a full opportunity to develop an evidentiary record and argue the motion, and to avoid delay at trial (which is scheduled to being in a few days), the Court will address the motion in *limine*.

## A. *The parties' contentions*

Wilson seeks to exclude the results of the Intoxilyzer test because the State failed to satisfy the bright-line rule established in *Clawson,* that a subject must be observed for 20 uninterrupted minutes before the test can be administered. The *Clawson* court made clear that the Intoxilyzer test starts when the officer puts the card into the machine.

---

[38] D.I. 27, 28, 30.
[39] 867 A.2d 187, 191-92 (Del. 2005) (citation omitted).

16

Wilson argues that Fiore "could not point to the exact time that his observation period of Mr. Wilson began, but instead claimed that his observation was continuous from the field sobriety tests through the administration of the Intoxilyzer test."[40] It is undisputed that Fiore inserted the Intoxilyzer card into the machine at 22:51. Thus, Wilson asserts the observation period began at 22:31 "at the very latest."[41] But, after Fiore sat next to Wilson in the Intoxilyzer room, he started the machine and took notes. At 22:32 Fiore turned his attention to observing Wilson, however, about thirty seconds later, he used the computer for approximately 57 seconds. Wilson concludes that because requisite 20-minute observation period was not met, and the quality of Fiore's observation was inadequate, the results of the Intoxilyzer test should be inadmissible.

The State responds that Fiore did observe Wilson for the requisite 20-minute period. The State contends that the observation period began at 22:26, before Fiore started the HGN test and thus, more than 20 minutes elapsed before the card was inserted into the machine.[42] The State also argues that while the duration of the observation period is subject to a bright-line rule, the quality of the observation is not, and Fiore was not required to have a "fixed gaze" on Wilson. Therefore, the proper foundation has been laid, and the test is admissible.

---

[40] D.I. 28, ¶ 7.
[41] *Id.* ¶ 8.
[42] D.I. 30, ¶ 10.

**B.**     *Standard or review*

The *Clawson* court addressed whether failure to meet the manufacturer's requirement of an uninterrupted 20-minute observation period before administering an Intoxilyzer test was a foundational perquisite to the admissibility of the test results.  The *Clawson* court found the rationale of *Holland v. Voshell* and *State v. Subrick* to be persuasive.

The 20-minute rule was first articulated in *Holland,* where the court held that a "'failure to demonstrate that there was a period of twenty minutes when [a] defendant [is] observed by the officer is a failure by the officer to follow the procedure required in the manufacturer's instructions.'"[43]  *Subrick* held "the twenty minute observation period established in *Holland* must be completed prior to inserting the [I]ntoxilyzer card, which begins testing."[44]

The Supreme Court in *Clawson* held that "in order for the result of the [I]ntoxilyzer test to be admitted, the State must lay an adequate evidentiary foundation showing that there was an uninterrupted twenty minute observation of the defendant prior to testing [and] that testing commenced when the officer inserts the [I]ntoxilyzer card into the machine."[45]  The purpose of the 20-minute observation

---

[43] *Clawson*, 867 A.2d at 192, quoting *Holland*, C.A. No. 86A-AP2, slip op. at 1 (Del. Super. Sept. 3, 1986) (modification in original).
[44] *Id.*, citing *Subrick*, C.A. No. 93-12-0496, Slip. Op. at 3 (Del. Com. Pl. Feb. 8, 1994).
[45] *Id.*

18

period is to ensure "that the mouth cavity is cleared of residual alcohol or other contaminates that may enter the mouth via smoking, eating, or drinking, or through regurgitation of material already in the body."[46]

While the quantitative demand of the observation period is subject to a bright-line test, the qualitative is not. The officer is not required to have a "fixed gaze" on the subject during the observation period. However, "the observation requirement cannot be satisfied where there is a lapse in an officer's visual or aural monitoring significant enough that the officer could miss the occurrence of eating, drinking, smoking, or regurgitation."[47]

## C.    *Discussion*

It is important to know when the observation period started to ensure that the Intoxilyzer test is not started before the expiration of the full 20-minute observation period. Fiore was not clear on when the observation period started. He testified when the period "could" have started and that he waited about four minutes after the "20-ish" minute period. He testified that in his report he indicated the period started at 22:30, which he derived from subtracting 24 minutes from when the test was completed. "Backing into" the start time in this manner is insufficient.

---

[46] *Webb-Buckingham v. State*, 2009 WL 147020, at \*3 (Del. Super. Jan. 22, 2009).
[47] *Id.*, at \*5 (Del. Super. Jan. 22, 2009); *see also State v. Sullivan*, 2017 WL 2256622 (Del. Com. Pl. May 23, 2017) (20-minute observation period not satisfied where it was interrupted when the defendant went into a private room to talk with his lawyer).

19

However, with the benefit of the BWC, we know the Intoxilyzer test started at 22:51. Therefore, to satisfy the bright-line test, the observation period had to start by 22:31. At 22:31, the HGN and VGN tests were complete and Wilson was facing Fiore as they continued to discuss why other SFSTs were not being administered. Wilson's back was to Fiore briefly as they walked into the room. Fiore sat a few feet from Wilson for the duration. During this period, there was no lapse in Fiore's visual or aural monitoring of Wilson.

While Fiore wrote some notes and worked on the computer for approximately 57 seconds, this is not a sufficient disruption in the observation period. Fiore would have been able to observe if Wilson smoked, drank, ate, or regurgitated and there is no suggestion that he did.

The Court finds that the 20-minute observation period is satisfied and the State has carried its burden to lay a foundation for the admissibility of the Intoxilyzer results. The Motion in *Limine* is DENIED.

**IT IS SO ORDERED.**

/s/Kathleen M. Miller
Kathleen M. Miller, Judge